**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gerome Montreal RANDALL,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Jeron Rondell Randall, Defendant–**
**Appellant.**

**Nos. 96–4308, 96–4396.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1998.

Decided April 5, 1999.

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant Gerome Randall; Richard Luby Cannon, III, Greenville, North Carolina, for Appellant Jeron Randall. J. Frank Bradsher, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** William Arthur Webb, Federal Public Defender, Raleigh, North Carolina, for Appellant Gerome Randall. Janice McKenzie Cole, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

Before MURNAGHAN, HAMILTON, and MICHAEL, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Hamilton wrote the opinion, in which Judge Murnaghan and Judge Michael joined.

# OPINION

HAMILTON, Circuit Judge:

Section 924(c), Title 18 of the United States Code, prohibits a person from using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States ...." The principal issue in this appeal is whether the defendants' convictions and sentences, under *Count Six* of the indictment, for using and carrying "a firearm, Model 17, 9 millimeter Glock handgun with a laser sight, [on or about October 11, 1995], during and in relation to a drug trafficking crime, ... *specifically, distribution of a narcotic controlled substance,*" inviolation of 18 U.S.C. § 924(c), and aiding and abetting such, in violation of 18 U.S.C. § 2, (J.A. 26) (emphasis added), must be reversed, because the government, through its presentation of evidence and its closing argument, and the district court, through its jury instructions, constructively amended Count Six of the indictment by allowing proof of an alternative § 924(c) predicate offense not charged in the indictment, *specifically, possession with intent to distribute drugs.* Because the predicate crime of violence or drug trafficking crime charged in the indictment is an essential element of a § 924(c) offense, and because the defendants' October 11, 1995 § 924(c) convictions under Count Six of the indictment rest upon proof of a different predicate offense—possession with intent to distribute—than the one specified in the indictment—distribution, we reverse Gerome Randall (Gerome) and his identical twin brother Jeron Randall's (Jeron) October 11, 1995 § 924(c) convictions under Count Six, vacate their respective sentences under Count Six, and remand for resentencing. This appeal also concerns a challenge by Jeron to the amount of cocaine base (crack) attributed to him by the district court for the purposes of sentencing. Finding this contention to be without merit, we affirm the district court's determination.

## I

Detective Jeff Robinson, while working as an undercover agent investigating drug trafficking for the Pitt County, North Carolina, Sheriff's Department Narcotics Division, met Gerome and discovered that Gerome and Jeron were involved in drug trafficking in Greenville, North Carolina, and Washington, North Carolina.[1] Specifically, in the fall of 1995, Detective Robinson met low-level drug dealer Derrick Rogers, who introduced Detective Robinson to drug dealer Toby Daniels, a friend of Gerome and Jeron's. Detective Robinson told Daniels that he was interested in purchasing large amounts of crack. On September 7, 1995, Daniels and Rogers took Detective Robinson to Gerome's apartment in Greenville, so that Daniels could arrange for Detective Robinson to purchase crack from one of Daniels' suppliers. While Daniels, Rogers, and Detective Robinson were waiting for the drug deal to consummate, Detective Robinson met Gerome. The deal between Daniels' supplier and Detective Robinson did not consummate. Gerome, however, gave Detective Robinson his phone number and told Detective Robinson to call him if he wanted to purchase crack.

Later on September 7, 1995, Detective Robinson called Gerome and went to Gerome's apartment to purchase crack. Detective Robinson followed Gerome to a parking lot, where Gerome met with one of his suppliers. Thereafter, Gerome sold Detective Robinson approximately thirty-five grams of crack, and during the sale, Gerome pointed a nine millimeter Glock firearm at Detective Robinson. Over the next week, Detective Robinson contacted Gerome several times in an attempt to purchase more crack. On September 13, 1995, Gerome sold Detective Robinson approximately eighty-four grams of crack.

The next day, Detective Robinson paged Gerome in an attempt to arrange another crack purchase. Jeron responded to the page, but Detective Robinson thought Gerome had responded to the page. Detective Robinson indicated that he might want to purchase some crack, and the person he later discovered was Jeron told him to page him if he did want to purchase crack.

Gerome called Detective Robinson the next day and, during their conversation, Detective Robinson discovered that he had actually been speaking with Jeron the previous day. Detective Robinson was then convinced that Jeron was also dealing crack and, therefore, Detective Robinson attempted to purchase crack at the barbershop, where Gerome and Jeron worked. Detective Robinson decided to stop by the barbershop during the day without a pre-arranged transaction, so that he might meet Jeron and identify Gerome and Jeron's drug suppliers.

Thus, on September 19, 1995, Detective Robinson called Gerome and told him he would stop by the barbershop in Washington. Upon arriving at the barbershop, Detective Robinson attempted to purchase two ounces of crack from Gerome, but Gerome indicated that he would not be able to meet with his supplier until later that evening. Because Detective Robinson told Gerome that he could not wait until later that evening to purchase crack, Gerome walked across the street and spoke with a street dealer about supplying him with some crack for Detective Robinson. While Detective Robinson and Gerome waited for the street dealer to go for the crack, Detective Robinson witnessed Jeron give Gerome a paper towel with eight or nine crackrocks in it and then witnessed someone off the street purchase one of the crack rocks from Gerome. Thereafter, the street dealer returned and gave Gerome the crack, which Gerome then sold to Detective Robinson. Jeron accompanied Detective Robinson to Detective Robinson's car to weigh the crack, which weighed

---

1. Gerome and Jeron sold crack to various persons, including Harry Brown and Clinton Dawson. Also, Toby Daniels and Jerry Midgette, a/k/a "Little Boo," sold crack for Gerome and Jeron, and saw Gerome and Jeron sell crack to others.

approximately fifty-four grams. Detective Robinson, at Gerome's instruction, paid Jeron for the crack.

Detective Robinson obtained arrest warrants for Gerome and Jeron and planned to arrest them after purchasing more crack and a firearm. On October 9, 1995, Detective Robinson called Gerome and attempted to arrange a purchase of four or five ounces of crack and a firearm. On October 10, 1995, Detective Robinson called Gerome twice, and during one of their conversations, Gerome told Detective Robinson that he was confident that he could supply Detective Robinson with the crack and a firearm the next day.

On the morning of October 11, 1995, Daniels rode with Gerome and Jeron to the barbershop in Jeron's car. After they arrived at the barbershop, the three men got out of the car, and Jeron instructed Daniels to push some plastic bags containing marijuana and crack under the driver's seat.

When Detective Robinson arrived at the barbershop later that morning, Gerome indicated that he did not have the firearm Detective Robinson wanted to purchase because his supplier had not yet paged him. Detective Robinson then asked Gerome if he could supply him with at least one ounce of crack, and Gerome indicated that he could. Gerome asked a street dealer, Cortez Branch, if he would sell Detective Robinson an ounce of crack, and Branch agreed to sell that amount to Detective Robinson for $1,200. A few minutes later, Iris Tucker, an associate of Branch's, gave, *i.e.*, distributed, an ounce of crack to Detective Robinson. Because Detective Robinson knew he was about to arrest Gerome, Detective Robinson returned the crack to Tucker without purchasing it. Detective Robinson told Tucker that he needed to go around the block to get the money.

· Detective Robinson went to his vehicle and advised the surveillance team to serve the arrest warrants on Gerome and Jeron. The surveillance team arrived and part of the team went inside the barbershop and arrested Gerome. A member of the surveillance team arrested Jeron outside the barbershop. An officer assisted the surveillance team member in the search of Jeron's car. Under the passenger's seat, the officers discovered a nine millimeter, loaded Glock firearm, which was later identified as the firearm that Gerome had pointed at Detective Robinson during the September 7, 1995 drug sale. Under the driver's seat, the officers found twenty-nine plastic bags, some containing small amounts of marijuana and others containing crack. In total, the officers recovered 46.9 grams of marijuana and 1.3 grams of crack from the bags they found under the driver's seat.

After the arrest, the officers advised Gerome and Jeron of their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Gerome and Jeron signed waiver-of-rights forms. Gerome then admitted that he had sold crack to Detective Robinson and that the nine millimeter Glock firearm found inside Jeron's car at the time of the arrest belonged to him (Gerome). Jeron acknowledged that he had sold crack to Detective Robinson on one occasion, had sold crack the previous year five or six times, but had only sold crack ten times in his lifetime.

Thereafter, on November 2, 1995 in a superseding indictment, a federal grand jury sitting in the Eastern District of North Carolina, Eastern Division, indicted Gerome and Jeron on the following six counts arising from their drug conspiracy: *Count One* charged both Gerome and Jeron with conspiring to distribute and to possess with intent to distribute crack from about the first part of September 1995 through September 19, 1995, in violation of 21 U.S.C. §§ 841(a)(1), 846; *Count Two* charged Gerome with distributing crack on or about September 7, 1995, in violation of 21 U.S.C. § 841(a)(1); *Count Three* charged Gerome with using and carrying "a firearm, a nine millimeter Glock

handgun," on or about September 7, 1995, during and in relation to a drug trafficking crime, specifically distribution of a narcotic controlled substance, in violation of 18 U.S.C. § 924(c) (J.A. 25); *Count Four* charged Gerome with distributing crack on or about September 13, 1995, in violation of 21 U.S.C. § 841(a)(1); *Count Five* charged Gerome and Jeron with distributing crack on or about September 19, 1995, in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting such, in violation of 18 U.S.C. § 2; and *Count Six* charged Gerome and Jeron with using and carrying "a firearm, Model 17, 9 millimeter Glock handgun with a laser sight, [on or about October 11, 1995], during and in relation to a drug trafficking crime, ... *specifically, distribution of a narcotic controlled substance*," in violation of 18 U.S.C. § 924(c), and aiding and abetting such, in violation of 18 U.S.C. § 2 (J.A. 26) (emphasis added).

At trial, the government presented testimony and evidence of Gerome and Jeron's various offenses arising from their conspiracy to distribute and to possess with intent to distribute crack. Detective Robinson testified about the various drug purchases that he made from Gerome and Jeron and about the arrest on October 11, 1995. Detective Robinson stated that on October 11, 1995, he attempted to purchase an ounce of crack from Gerome, but did not actually purchase the crack because he was about to arrest Gerome.

The government attempted to prove the October 11, 1995 § 924(c) violation charged in *Count Six* by showing that Gerome and Jeron drove Jeron's car on the morning of October 11, 1995, with the nine millimeter Glock firearm under the passenger's seat and the drugs under the driver's seat. The government presented the testimony of Deputy Leonard Hudson, the supervisor of the Pitt County, North Carolina, Sheriff's Department Narcotics Division, who testified that after he placed Jeron under arrest he found a nine millimeter Glock firearm under the passenger's seat of Jer-

on's car and the plastic bags containing 46.9 grams of marijuana and 1.3 grams of crack under the driver's seat. Additionally, the government presented the testimony of Daniels who testified that he had sold crack for Gerome and Jeron on a daily basis from late August 1995 until Gerome and Jeron's arrest on October 11, 1995. Daniels stated that Gerome and Jeron often gave him a ride to work, and that Gerome and Jeron usually carried a firearm when they gave him a ride. Daniels testified that Gerome owned a nine millimeter Glock firearm and that Jeron owned a nine millimeter Ruger pistol. According to Daniels, he rode with Gerome and Jeron to the barbershop in Jeron's car on the morning of October 11, 1995, and Jeron told him to make sure the plastic bags containing marijuana and crack were pushed under the driver's seat. Daniels stated that he pushed the plastic bags containing marijuana and crack under the driver's seat but did not see a firearm under the passenger's seat.

In urging the jury to convict Gerome and Jeron on the October 11, 1995 § 924(c) violation under Count Six, the government stated in its closing argument:

Now, ladies and gentlemen, there's no counts that you will consider that has to do with distribution that day. Gerome went to try to make a deal that day and he is not charged with a distribution that day he is however charged in a count, again, of using or carrying a gun during and in relation to a drug trafficking crime....

In this case, this car was driven that morning ... and they had taken one or two guns and put them in the car and they carried them.

And there was also crack cocaine in the car.... Where was the gun and cocaine located? They were located in that car, under the same seat, under the front passenger seat where it would still be readily available....

And it was Jeron's car that Jeron was getting into and it was Mr. Gerome

Randall's gun, so both should be held responsible for this offense, carrying a gun during and in relation to a drug trafficking offense. The drugs were ready for the distribution where a person like Tony Daniels or Midget or Boo sold the drugs.

(J.A. 375–77).

After closing arguments, the district court instructed the jury on the six counts. In instructing the jury on the § 924(c) counts, the district court stated:

Count [T]hree of the [i]ndictment charges that on or about September the 7th of 1995, the defendant Gerome Montreal Randall knowingly used and carried a firearm during and in relation to a drug trafficking crimes [sic]. That's Count three.

Count [S]ix charges that on or about October 11, 1995, the defendants Gerome Montreal Randall and Jeron Rondell Randall knowingly used and carried a firearm during and in relation to a drug traffic crime and/or aided and abetted each other. . . .

In order to meet its burden of proof for the crime of using or carrying a firearm during and in relation to a drug trafficking crime, the Government must prove beyond a reasonable doubt the following two elements that the defendant committed a drug trafficking crime; and second, that during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

The offenses alleged in Counts One, Two, Four and Five of the indictment are drug trafficking crimes. A drug trafficking crime means any felony violation of federal law, including 21 United States Code Section 841(a)(1) involving possession with intent to distribute or the distribution [of] any controlled substance or conspiracy to distribute a controlled substance.

If you find the named defendant guilty of the underlying drug trafficking crime alleged in the [i]ndictment, then as a matter of law, this constitutes a drug trafficking crime. (J.A. 410–11).[2] After deliberations, the jury convicted Gerome and Jeron on all counts.

The district court sentenced *Gerome* to concurrent 235–month terms of imprisonment for the substantive drug offenses charged in Counts One, Two, Four and Five, a consecutive sixty-month term of imprisonment for the September 7, 1995 § 924(c) violation charged in Count Three, and a consecutive 240–month term of imprisonment for the October 11, 1995 § 924(c) violation charged in Count Six, for a total of 535 months. The district court also imposed five-year concurrent terms of supervised release for the substantive offenses charged in Counts One, Two, Four and Five, and three-year concurrent terms of supervised release for the § 924(c) violations charged in Counts Three and Six, to be served concurrently with the five-year concurrent terms for the offenses charged in Counts One, Two, Four and Five. Additionally, the district court ordered Gerome to pay a $300 special assessment and a $12,000 fine.

The district court sentenced *Jeron* to concurrent 300–month terms of imprisonment for the substantive drug offenses charged in Counts One and Five and a consecutive sixty-month term of imprisonment for the October 11, 1995 § 924(c) violation charged in Count Six, for a total of 360 months of imprisonment. The district court also sentenced Jeron to concurrent five-year terms of supervised release for the substantive offenses charged in Counts One and Five and a concurrent three-year term of supervised release for the October 11, 1995 § 924(c) violation charged in Count Six, to be served concurrently with the five-year concurrent terms for the offenses charged in Counts One and Five. Additionally, the district court

---

**2.** Gerome and Jeron did not object to the district court's instructions to the jury.

ordered Jeron to pay a $150 special assessment and a $30,000 fine.

Gerome and Jeron noted timely appeals. On appeal, Gerome and Jeron challenge their October 11, 1995 § 924(c) convictions and sentences under Count Six of the indictment, and Jeron takes issue with the amount of crack attributed to him by the district court at sentencing.

## II

Gerome and Jeron contend that their convictions and sentences under Count Six for using and carrying "a firearm, Model 17, 9 millimeter Glock handgun with a laser sight, [on or about October 11, 1995], during and in relation to a drug trafficking crime, ... *specifically, distribution of a narcotic controlled substance,*" in violation of 18 U.S.C. § 924(c), and aiding and abetting such, in violation of 18 U.S.C. § 2, (J.A. 26) (emphasis added), must be reversed, because the government, through its presentation of evidence and its closing argument, and the district court, through its jury instructions, constructively amended Count Six of the indictment by allowing proof of an alternative § 924(c) predicate offense not charged in the indictment—possession with intent to distribute drugs. We agree.

██ The Fifth Amendment to the United States Constitution, which in relevant part provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...," U.S. Const. amend. V., " 'guarantees that a criminal defendant will be tried only on charges in a grand jury indictment.' " *United States v. Reyes,* 102 F.3d 1361, 1364 (5th Cir. 1996) (quoting *United States v. Arlen,* 947 F.2d 139, 145 (5th Cir.1991)). Therefore, only the grand jury may broaden or alter the charges in the indictment. *See Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

██ When the government, through its presentation of evidence and/or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs. *See United States v. Redd,* 161 F.3d 793, 795 (4th Cir.1998). A constructive amendment is a fatal variance because the indictment is altered "to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Schnabel,* 939 F.2d 197, 203 (4th Cir. 1991). Thus, a constructive amendment violates the Fifth Amendment right to be indicted by a grand jury, is error *per se,* and must be corrected on appeal even when the defendant did not preserve the issue by objection. *See United States v. Floresca,* 38 F.3d 706, 712–13 (4th Cir. 1994) (*en banc* ).

██ However, not all differences between an indictment and the proof offered at trial, rise to the "fatal" level of a constructive amendment. *See Redd,* 161 F.3d at 795. When different evidence is presented at trial but the evidence does not alter the crime charged in the indictment, a mere variance occurs. *See id.* A mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense. *See id.*

██ Count Six charged Gerome and Jeron with using and carrying "a firearm, Model 17, 9 millimeter Glock handgun with a laser sight, [on or about October 11, 1995], during and in relation to a drug trafficking crime, ... *specifically, distribution of a narcotic controlled substance,*" in violation of 18 U.S.C. § 924(c), and aiding and abetting such, in violation of 18 U.S.C. § 2. (J.A. 26) (emphasis added). However, the government's evidence linked the October 11, 1995 § 924(c)

charge under Count Six, not to the charged predicate offense of distribution, *but to the predicate offense of possession with intent to distribute.* Specifically, the government presented evidence that after Detective Robinson's attempted purchase of drugs (during which no firearm was used or carried) failed to consummate, the surveillance team arrested Gerome inside the barbershop and Jeron outside the barbershop. When the officers searched Jeron's car, they found under the passenger's seat a firearm and under the driver's seat twenty-nine plastic bags, some containing marijuana and some containing crack, for a total of 49.9 grams of marijuana and 1.3 grams of crack. In its closing argument, the government also tried to link the October 11, 1995 § 924(c) charge under Count Six to the predicate offense of possession with intent to distribute. Specifically, in its closing argument, the government stated:

> [I]t was Jeron's car that Jeron was getting into and it was Mr. Gerome Randall's [sic] gun, so both should be held responsible for this offense, carrying a gun during and in relation to a drug trafficking crime. The drugs were ready for the distribution where a person like Toby Daniels or Midget or Boo sold the drugs.[3]

(J.A. 376–77).

The district court's instructions also allowed the jury to convict Gerome and Jeron of the October 11, 1995 § 924(c) charge on a finding that the firearm found under the passenger's seat was used or carried during and in relation to the possession with the intent to distribute the marijuana and crack found under the driver's seat of Jeron's car:

> Count [S]ix charges that on or about October 11, 1995, the defendants Gerome Montreal Randall and Jeron Rondell Randall knowingly used and carried a firearm during and in relation to a drug traffic crime and/or aided and abetted each other. . . .

In order to meet its burden of proof for the crime of using or carrying a firearm during and in relation to a drug trafficking crime, the Government must prove beyond a reasonable doubt the following two elements that the defendant committed a drug trafficking crime; and second, that during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

The offenses alleged in Counts One, Two, Four and Five of the indictment are drug trafficking crimes. A drug trafficking crime means any felony violation of federal law, including 21 United States Code Section 841(a)(1) involving possession with intent to distribute or the distribution [of] any controlled substance or conspiracy to distribute a controlled substance.

If you find the named defendant guilty of the underlying drug trafficking crime alleged in the [i]ndictment, then as a

---

**3.** The government does not contend that the evidence of Gerome and Tucker's distribution of crack to Detective Robinson on October 11, 1995, supports Gerome and Jeron's October 11, 1995 § 924(c) convictions under Count Six. Obviously, the government recognizes that an attempt to tie Gerome and Tucker's drug distribution to Detective Robinson on the street outside the barbershop to the firearm located under the passenger's seat of Jeron's car parked outside the barbershop would be problematic under *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), and its progeny. *See United States v. Mitchell,* 104 F.3d 649, 654 (4th Cir.1997) ("A firearm is carried 'in relation to' a drug trafficking offense if it has 'some purpose or effect with respect to the drug trafficking crime' and if its presence was not 'the result of accident or coincidence.' The firearm must facilitate, or potentially facilitate, the drug trafficking offense.") (quoting *Smith v. United States,* 508 U.S. 223, 238, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). Thus, the government is forced to rely on the evidence found in the car, the nine millimeter Glock firearm and the plastic bags containing marijuana and crack, in order to support Gerome and Jeron's October 11, 1995 § 924(c) convictions under Count Six.

matter of law, this constitutes a drug trafficking crime.

(J.A. 410–11).

 Gerome and Jeron's contention that the government, through its presentation of evidence and its argument, and the district court, through its jury instructions, constructively amended their October 11, 1995 § 924(c) charges under Count Six by allowing the jury to consider a different § 924(c) underlying predicate offense—specifically, *possession with intent to distribute crack and marijuana*—than the § 924(c) predicate offense charged in the indictment—*distribution of a narcotic controlled substance*—is predicated on two subsidiary contentions. First, proof of a predicate offense is an essential element of a § 924(c) violation. Second, if the government specifies in the indictment a particular type of § 924(c) predicate offense, *e.g.*, distribution, the government is required to prove the essential elements of the specified predicate offense (or, at a minimum, a lesser included offense of the predicate offense).[4] There is no dispute between the parties as to the first subsidiary contention—that proof of a predicate offense is an essential element of a § 924(c) violation. *See United States v. Crump*, 120 F.3d 462, 466 (4th Cir.1997) ("In accordance with the views of all the circuits considering the question, we hold that a defendant's conviction under § 924(c)(1) does not depend on his being convicted—either previously or contemporaneously—of the predicate offense, as long as all of the elements of that offense are proved and found beyond a reasonable doubt."); *see also United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir.1994); *Reyes*, 102 F.3d at 1365 ("[P]roof of the defendant's guilt of a predicate offense is

an essential element of a conviction under § 924(c)(1).").

 The second subsidiary contention—whether the government is required to prove the essential elements of the charged § 924(c) predicate offense (or, at a minimum, a lesser included offense of the charged § 924(c) predicate offense)—is more troublesome, as the government is under no obligation to specify a specific predicate offense in a § 924(c) charge. *See Crump*, 120 F.3d at 466. Although e have not addressed this exact issue, two of our sister circuits have squarely done so and have concluded that if the government specifies in the indictment the § 924(c) predicate offense on which it is relying, "[a] conviction that rests, no matter how comfortably, on proof of another [predicate] offense cannot stand." *Willoughby*, 27 F.3d at 266; *see Reyes*, 102 F.3d at 1365.

The Seventh Circuit in *Willoughby* addressed the precise issue before us—whether a defendant's § 924(c) conviction requires reversal when the indictment charges the defendant with using or carrying a firearm during and in relation to the predicate offense of distribution of drugs but the evidence shows that the defendant used a firearm during and in relation to the predicate offense of possession with intent to distribute drugs. *See* 27 F.3d at 265–67. Specifically, in *Willoughby*, the indictment charged, among other offenses, that the defendant had been " 'using or carrying' a 'gun during and in relation to . . . the distribution of cocaine' in violation of 18 U.S.C. § 924(c)." *Id.* at 263. The defendant pleaded guilty to possession with intent to distribute drugs, but the case proceeded to a bench trial on the § 924(c) charge. *See id.* Even though the

---

4. Obviously, if the government, through its evidence, links a § 924(c) charge to a lesser included offense of the charged predicate offense, it would be a mere variance. For example, if the government, through its evidence, links a § 924(c) charge to the predicate offense of possession, instead of the charged § 924(c) predicate offense of pos-

session with intent to distribute, a mere variance would result. *Cf. United States v. Davidson*, 768 F.2d 1266, 1272 (11th Cir. 1985) (finding mere variance where indictment charged possession with intent to distribute but district court instructed jury on the lesser included offense of attempted possession with intent to distribute).

indictment linked the § 924(c) violation to the predicate offense of distribution, the government at trial sought to link the § 924(c) violation to the predicate offense of possession with intent to distribute. *See id.* at 264–65. The government presented evidence that the defendant distributed drugs to a confidential informant and was thereafter arrested. *See id.* at 264. The government also presented evidence that after his arrest, the defendant consented to a search of his residence and his storage unit. *See id.* At the storage unit, the officers discovered on the backseat of an inoperable car a box containing a loaded revolver, triple beam scales, and several "plastic baggies," and also found a suitcase containing "164 grams of cocaine, 47.1 grams prepackaged in 91 small ziploc baggies, and several hundred empty small plastic baggies." *Id.* The government contended that because the evidence established that the defendant used or carried the gun during and in relation to possession with intent to distribute, the defendant should be convicted on the § 924(c) charge. The district court found the defendant guilty on the § 924(c) charge. *See id.* at 265.

On appeal, the defendant challenged his § 924(c) conviction. *See id.* Specifically, the defendant contended that "because the language of the indictment charged him with using the gun during and in relation to distribution of cocaine as opposed to possession with intent to distribute cocaine, there must be some evidence that the gun facilitated a *distribution* for the § 924(c) conviction to stand." *Id.* (emphasis added). The Seventh Circuit held that the government, by specifying in the indictment the drug trafficking crime of distribution in the § 924(c) charge, had made the essential elements of distribution essential elements of the § 924(c) violation, even though the evidence established "what would have been an adequate replacement offense if charged"—possession with intent to distribute. *Id.* at 266. The Seventh Circuit stated:

Thus, even if an adequate § 924(c) charge need not indicate by name a particular drug trafficking offense, by the way it framed the indictment in this case, the government narrowed the legitimate scope of the weapons charge to [the defendant's] use of a firearm in connection with the distribution of cocaine, not the mere possession with intent to distribute cocaine or "drug trafficking" generally. A conviction relying upon a link between the gun and the latter described conduct would constitute an impermissible broadening of the indictment, for its basis was necessarily excluded from the charge as phrased. *Id.*

The Seventh Circuit then addressed whether proof of possession with intent to distribute drugs, as opposed to distribution of drugs, constituted a constructive amendment or a mere variance. *See id.* at 265–67. The Seventh Circuit concluded that, based upon the evidence that only established the predicate offense of possession with intent to distribute, a conviction relying upon a link between the firearm and the charged predicate offense—distribution of drugs—constituted a constructive amendment. *See id.* at 266–67. Specifically, the Seventh Circuit reasoned:

The discrepancy here is more than a simple matter of semantics unrelated to the substance of the offense charged. Distribution and possession with intent to distribute are two separate trafficking offenses, two separate crimes.... Because "distribution" relates to different conduct than does "possession with intent to distribute[,"] not just in theory, but in this case, a charge referencing one of these trafficking offenses cannot be deemed the equivalent of a charge referencing the other. And since no evidence linked the gun to [the defendant's] actual distribution of cocaine ... and no evidence indicated that any distribution occurred at the storage facility [where the gun was "used" in connection with the drug trafficking crime of pos-

session with the intent to distribute] ... and because a hypothetical future distribution is not a legitimate basis for a current conviction, the weapons conviction could only have been based upon a possession-protection theory, a valid ground in this circuit but not when it falls outside the scope of the indictment. *Id.* (internal citation omitted). Therefore, the Seventh Circuit concluded that the defendant's conviction for the § 924(c) violation in connection with the predicate offense of distribution of drugs required reversal. *See id.* at 267.

Another of our sister circuits has addressed a similar issue to that raised in *Willoughby. See Reyes,* 102 F.3d at 1364–65. The Fifth Circuit in *Reyes* addressed whether a constructive amendment occurred when the district court instructed the jury that it could convict the defendant on a different § 924(c) predicate offense than the § 924(c) predicate offense charged in the indictment. *See id.* In *Reyes,* a grand jury indicted the defendant for, among other things, "using and carrying a firearm during and in relation to the drug-trafficking crime of possession with intent to distribute" drugs. *Id.* at 1362. The case proceeded to trial, and, at trial, the evidence established that the defendant "carried" a firearm during and in relation to conspiracy to possess with intent to distribute drugs. *See id.* at 1363. Specifically, arresting officers found a loaded weapon and six marijuana cigarettes in the defendant's backpack and "found fifteen weapons [and] two plastic bags containing [two pounds of] marijuana" in his suitcase. *Id.* The district court "instructed the jury that it could convict [the defendant] under § 924(c)(1) based upon proof that he was guilty of a conspiracy [to possess with intent to distribute

drugs] rather than [possession with intent to distribute drugs as charged in the indictment]." *Id.* at 1365. The jury found the defendant guilty of the § 924(c) charge. *See id.* at 1362.

On appeal, the defendant challenged his conviction on the § 924(c) charge. *See id.* at 1364. The Fifth Circuit concluded that while the "evidence was sufficient for a rational jury to conclude that [the defendant] ... 'carri[ed]' a firearm during and in relation to a drug trafficking crime," *id.,* the district court constructively amended the indictment when it instructed the jury that it could convict the defendant on the § 924(c) charge based upon a different predicate offense than the one charged in the indictment. *See id.* at 1365. Specifically, the Fifth Circuit first held "that proof of the defendant's guilt of a predicate offense is an essential element of a conviction under § 924(c)(1)." *Id.* The Fifth Circuit then determined whether the district court, in instructing the jury that it could convict the defendant on the § 924(c) predicate offense of conspiracy to possess with intent to distribute drugs, had altered an essential element of the charged § 924(c) offense. *See id.* The Fifth Circuit concluded "that a conspiracy to possess with the intent to distribute marijuana has different elements than does the substantive offense of possession with intent to distribute." *Id.* Accordingly, the Fifth Circuit "conclude[d] that the district court constructively amended the indictment by modifying an essential element of the charged offense when it instructed the jury that it could convict [the defendant] under § 924(c)(1) based upon proof that he was guilty of a conspiracy [rather than the charged § 924(c) predicate offense of possession with intent to distribute]."[5] *Id.*

---

**5.** Nonetheless, even though the Fifth Circuit in *Reyes* found that the constructive amendment to the indictment constituted error, the court decided to exercise its discretion under *United States v. Olano,* 507 U.S. 725, 735, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), not to

correct the error. *See Reyes,* 102 F.3d at 1365. The Fifth Circuit reasoned:

Our decision today is not meant to imply that overwhelming evidence of guilt is sufficient, by itself, to sustain a conviction under the plain error standard. Rather, we merely conclude that under the unusual circum-

208

In the instant case, as in *Willoughby* and *Reyes,* the government was not required to separately charge or convict the defendants of the § 924(c) predicate offense. *See Crump,* 120 F.3d at 466. Nor was the government required to specify a specific § 924(c) predicate offense in the § 924(c) charge in the indictment. *See id.* However, the government did in fact specify the § 924(c) predicate offense on which it was relying, and this specification of the § 924(c) predicate offense in the indictment is of considerable consequence.

The Supreme Court in *Stirone,* held that even though the government could draw an indictment charging in general terms that the defendant violated the Hobbs Act, 18 U.S.C. § 1951, without specifying the particular type of commerce that was burdened, if the government specified in the indictment the particular type of commerce burdened, then it was not allowed to rely on proof that another type of commerce was burdened. 361 U.S. at 218–19, 80 S.Ct. 270.

In *Stirone,* the government charged that the defendant violated the Hobbs Act, and specified that interstate commerce was burdened by the importation of sand. *Id.* at 213–14, 80 S.Ct. 270. However, the government's proof at trial established that the defendant burdened interstate commerce not only by importation of sand but also by interstate exportation of steel. *Id.* at 214, 80 S.Ct. 270. The trial court instructed the jury that it could convict if either type of commerce was burdened. *Id.* The Supreme Court concluded that the indictment was constructively amended. *Id.* at 217–19, 80 S.Ct. 270.

In drawing such conclusion, the Supreme Court reasoned:

> stances presented by this case-including a jury instruction on a predicate offense permitted by § 924(c)(1), a separate conviction by the jury on the instructed predicate offense in circumstances in which the jury clearly rejected [the defendant's] contention that he did not knowingly possess marijuana, overwhelming evidence of guilt of both the charged offense and the instructed of-

Here, as the trial court charged the jury, there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference. It follows that when only one particular commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened. The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment.

*Id.* at 218–19, 80 S.Ct. 270. Further, the Supreme Court concluded that such a constructive amendment was fatal:

> Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition of charging interference with steel exports here is neither trivial, useless, nor innocuous. While there was a variance in the sense of a variance between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.

fense, and substantial incentive for sandbagging by the appellant-reversal of [the defendant's] conviction is not warranted. *Id.* at 1366.

In contrast, however, this court has held that constructive amendments are error *per se* and "must be corrected on appeal even when not preserved by objection." *Floresca,* 38 F.3d at 714.

*Id.* at 217, 80 S.Ct. 270; *see, e.g., United States v. Adams,* 778 F.2d 1117, 1125 (5th Cir.1985) (finding constructive amendment when indictment charged falsity when purchasing handgun, specifically by misrepresenting name, and jury instruction also charged falsity by misrepresenting residence—even though the conviction might have rested on a more general indictment that omitted the specific reference to the defendant).

Accordingly, under *Stirone, Willoughby,* and *Reyes,* the government was required to prove the elements of the charged § 924(c) predicate offense of distribution. Having reached this conclusion, we must determine whether the government's proof at trial and the district court's instructions to the jury in this case modified an essential element—the § 924(c) predicate offense of distribution—and amounted to a constructive amendment of the October 11, 1995 § 924(c) charge under Count Six of the indictment. To make this determination we must compare the elements of the two predicate offenses to determine whether the two predicate offenses are different offenses, and thus whether two § 924(c) charges linked to the different predicate offenses, respectively, result in two different § 924(c) offenses.

Here, we are comparing two separate clauses within the same statute to determine if they are different offenses. *See* 21 U.S.C. § 841(a). *Cf. Prince v. United States,* 352 U.S. 322, 327–28, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957) (addressing, in another context, offense conduct listed in separate clauses within the same statute). Section 841(a) of Title 21 of the United States Code provides: "[I]t shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

■ The elements of possession with intent to distribute of a narcotic controlled substance are as follows: (1) possession of the narcotic controlled substance, (2) knowledge of the possession, and (3) intent to distribute the narcotic controlled substance. *See United States v. Crockett,* 813 F.2d 1310, 1316 (4th Cir.1987). The elements of distribution of a narcotic controlled substance are as follows: (1) distribution of the narcotic controlled substance, (2) knowledge of the distribution, and (3) intent to distribute the narcotic controlled substance. *See United States v. Tran Trong Cuong, M.D.,* 18 F.3d 1132, 1137 (4th Cir.1994). The term "distribute" means "to deliver ... a controlled substance ...," and the term "deliver" means "the actual, constructive, or attempted transfer of a controlled substance ... whether or not there exists an agency relationship." *See* 21 U.S.C. §§ 802(8), (11); *see also United States v. Washington,* 41 F.3d 917, 919 (4th Cir.1994). Thus, we conclude that possession with intent to distribute and distribution are necessarily two different offenses. *See Goodson v. United States,* 564 F.2d 1071, 1073 (4th Cir.1977); *United States v. Curry,* 512 F.2d 1299, 1305–06 (4th Cir.1975).

■ To be sure, this court, along with many of our sister circuits, has concluded in the context of the application of the Double Jeopardy Clause that possession with intent to distribute and distribution under § 841(a) are two different offenses. *See Goodson,* 564 F.2d at 1073; *Curry,* 512 F.2d at 1305–06; *see also, e.g., United States v. Gore,* 154 F.3d 34, 45–47 (2d Cir.1998). Clearly, distribution requires an element that is not an element of possession with intent to distribute—distribution. *See Gore,* 154 F.3d at 45; *United States v. Sepulveda,* 102 F.3d 1313, 1316 (1st Cir.1996). Also, possession with intent to distribute requires an element that is not necessarily an element of distribution—possession. *See Gore,* 154 F.3d at 45; *United States v. Tejada,* 886 F.2d 483, 490 (1st Cir.1989); *United States v. Zabaneh,* 837 F.2d 1249, 1257 (5th Cir.1988); *United States v. Brunty,* 701 F.2d 1375, 1381 & n. 16 (11th Cir.1983); *United States v. Winston,* 687 F.2d 832, 834 n. 2

(6th Cir.1982); *United States v. Nelson,* 563 F.2d 928, 931 (8th Cir.1977). Succinctly stated, when there is independent evidence of the defendant's prior possession of the controlled substance before the actual time of distribution, the two offenses remain distinct. *See Goodson,* 564 F.2d at 1073; *see also Gore,* 154 F.3d at 45–47; *Tejada,* 886 F.2d at 490; *Zabaneh,* 837 F.2d at 1257; *United States v. Stevens,* 521 F.2d 334, 336–37 (6th Cir.1975). "The discrepancy here is more than a simple matter of semantics unrelated to the substance of the offense charged." *Willoughby,* 27 F.3d at 266. "Because 'distribution' relates to different conduct than does 'possession with intent to distribute', not just in theory, but in this case, a charge referencing one of these trafficking offenses cannot be deemed the equivalent of a charge referencing the other." *Id.* at 267.

In this case, even though the government was not required to specify on which § 924(c) predicate offense it was relying, because the government did indeed specify in the indictment that it was relying on the predicate offense of distribution, it was not allowed through the presentation of its evidence and its argument, and the district court was not allowed through its jury instructions, to broaden the bases of conviction to include the different § 924(c) predicate offense of possession with intent to distribute. *See Willoughby,* 27 F.3d at 266 ("The discrepancy here is more than a simple matter of semantics unrelated to the substance of the offense charged."). Such a constructive amendment must be corrected on appeal, even though Gerome or Jeron failed to preserve the issue by objection. *See Floresca,* 38 F.3d at 714 ("[W]e hold that, under *Stirone,* constructive amendments of a federal indictment are error *per se,* and, under *Olano,* must be corrected on appeal even when not preserved by objection."). Accordingly, we

reverse Gerome and Jeron's October 11, 1995 § 924(c) convictions under Count Six, vacate their respective sentences under Count Six, and remand for resentencing.[6]

## III

■■■■ Next, Jeron contends that the district court incorrectly calculate the amount of crack attributable to him for sentencing purposes. We review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error. *See United States v. McDonald,* 61 F.3d 248, 255 (4th Cir.1995). In determining the amount of drugs attributable to a defendant convicted of drug conspiracy, the district court may consider relevant information that is prohibited from being introduced at trial, including coconspirators' hearsay statements that it determines reliable, after giving the defendant an opportunity to rebut or explain the hearsay statements. *See United States v. Falesbork,* 5 F.3d 715, 722 (4th Cir.1993). Further, the district court may attribute to the defendant the total amount of drugs involved in the conspiracy, provided the drug quantities were reasonably foreseeable to the defendant and are within the scope of the conspiratorial agreement. *See United States v. Irvin,* 2 F.3d 72, 77 (4th Cir.1993). The government must prove the drug quantities attributable to the defendant by a preponderance of the evidence. *See United States v. Vinson,* 886 F.2d 740, 741–42 (4th Cir.1989). "Neither the Guidelines nor the courts have required precise calculations of drug quantity." *United States v. Uwaeme,* 975 F.2d 1016, 1019 (4th Cir.1992). A district court's approximation of the amount of drugs is not clearly erroneous if supported by competent evidence in the record. *See id.* If the district court relies

---

**6.** Gerome and Jeron offer several alternative grounds for reversing their October 11, 1995 § 924(c) convictions and vacating their respective sentences under Count Six. However, because we conclude that their October

11, 1995 § 924(c) charge under Count Six was constructively amended, it is not necessary for us to address Gerome and Jeron's alternative contentions.

on information in the presentence report (PSR) in making findings, the defendant bears the burden of establishing that the information relied on by the district court in making its findings is incorrect; mere objections are insufficient. *See United States v. Love*, 134 F.3d 595, 606 (4th Cir.1998).

After reviewing Jeron's revised PSR, considering the trial testimony, and holding a sentencing hearing, the district court found by a preponderance of the evidence that 2,497.45 grams of crack were reasonably foreseeable to Jeron through the conspiracy, but in any event at least 1.5 kilograms of crack were attributable to Jeron through the conspiracy, resulting in a total offense level of thirty-eight. *See* United States Sentencing Commission, *Guidelines Manual*, §§ 2D1.1(a)(3), (c)(1). Specifically, the district court stated:

All right, on the amount of drugs and the objection by the Defendant to the amount, the Court finds as follows as relates to the Defendant Jeron Randall: on September 7, 1995, the amount was 33.6 grams; on September 13, 1995, the amount was 82.2 grams; on September 19, 1995, the amount was 54.1 grams; on October 11, 1995, the amount was 1.3 grams. From Toby Daniels rated amount he sold for the Randall's, I find that to be two hundred grams; Toby Daniels, I rated the amount b[r]ought by the Randall's supplier to their apartment, that's 113.4 grams. Jerry Midgette, I break that down into three areas: the amount Midgette himself sold, I find that to be a minimum of 680.4 grams; and from Jerry Midgette I find the amount, as a minimum, that the Randall's sold at the barber shop is 595.35 grams; and then Jerry Midgette as to the amount the Randall's sold from their apartment, I find as a minimum that to be 595.35 grams. I find from the testimony of the interviewing officer of the other salespersons, Clinton Dawson, 85.05 grams and Harry Brown 56.7 grams. This totals 2,497.45 grams to

the extent the pre-sentence report still propositioned that the total amount of crack cocaine attributed to Jeron Randall was 1,922.15; I find that in error and that being an understatement by something like a half kilogram. So, now the total is 2,497.45. I find that all by a preponderance of the evidence. The Court would note by asterisk that even if the Court was to discount the Clinton Dawson or the Harry Brown or the Toby Daniels amount, there would still be more than 1.5 kilograms, which equates to a level 38.

(J.A. 600).

Jeron challenges the district court's findings with regard to the 1871.1 grams of crack attributed to him through Midgette, asserting that Midgette's statement to Detective Robinson was hearsay and unreliable. We conclude, however, that the district court's findings of the amount of crack attributable to Jeron through Midgette were not clearly erroneous. Detective Robinson testified at sentencing that Midgette admitted that, during the three and one-half to four weeks he was involved in the conspiracy, he sold two ounces a day for a minimum of four days per week. Detective Robinson further testified at sentencing that Midgette stated that during the time he was involved in the conspiracy, Gerome and Jeron sold from the barbershop a minimum of one ounce (28.35 grams) of crack per day, five days per week, and a minimum of one additional ounce (28.35 grams) of crack daily from their apartments.

A coconspirator's statement not made in furtherance of the conspiracy is hearsay, not admissible at trial. *See United States v. Blackshire*, 538 F.2d 569, 571 (4th Cir.1976). However, a coconspirator's hearsay statement may be considered by a district court at sentencing, if the district court considers the statement reliable. *See Falesbork*, 5 F.3d at 722. If the district court makes findings based on information in the PSR, the defendant must

affirmatively show that such information was incorrect. *See Love*, 134 F.3d at 606.

The district court reviewed the amount of crack attributable to Jeron through Midgette in the revised PSR and also heard testimony at sentencing from Detective Robinson about the amount of crack Midgette admitted to Detective Robinson that he sold for Gerome and Jeron. The district court, after offering Jeron a chance to rebut and explain Midgette's statement, concluded that Midgette's statement, as testified to by Detective Robinson at sentencing, accurately reflected the amount of crack attributable to Jeron through Midgette. Further, the district court found that the revised PSR underestimated the amount of crack attributable to Jeron through Midgette.

We are not in a position to take issue with the district court's finding that Midgette's statement, as testified to by Detective Robinson, was reliable. *See United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989). We, therefore, conclude that the district court's reliance on Midgette's statement, even though hearsay, was not error. *See Falesbork*, 5 F.3d at 722. Because Midgette's statement constitutes competent evidence that supports the district court's findings concerning the amount of crack Midgette sold for Gerome and Jeron, and the amount Midgette witnessed Gerome and Jeron sell, we conclude that the district court's determination that 1,871.10 grams of crack were attributable to Jeron through Midgette was not clearly erroneous.

█ In sum, because competent evidence indicates that at least 1.5 kilograms of crack were attributable to Jeron through (1) the purchases Detective Robinson made from Gerome and Jeron, (2) the amount Midgette sold for Gerome and

Jeron, and (3) the amount Midgette witnessed Gerome and Jeron sell, we affirm the district court's determination that at least 1.5 kilograms of crack were attributable to Jeron for sentencing purposes.[7]

### IV

For the foregoing reasons, we reverse Gerome and Jeron's convictions on their October 11, 1995 18 U.S.C. § 924(c) violations under Count Six, vacate their respective sentences under Count Six, and remand for resentencing. We affirm the district court's determination of the amount of crack attributable to Jeron.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.*

---

7. Jeron also contends that the district court erred in determining the amount of crack attributable to him through Daniels, Brown, and Dawson. We conclude that even if the district court erred in calculating the amount attributable to Jeron through Daniels, Brown,

and Dawson, the error would be harmless because, as the district court noted, even if such amounts were discounted, 1.5 kilograms of crack were attributable to Jeron, and, therefore, Jeron's total offense level would remain at thirty-eight.