**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

FRANK J. MASIARCZYK, JR.; LINDA M.
MASIARCZYK,
            *Defendants-Appellants.*

No. 99-4536

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(CR-97-39)

Argued: September 26, 2000

Decided: January 12, 2001

Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Richard Dwight Biggs, LAW OFFICE OF MARCIA G.
SHEIN, P.C., Atlanta, Georgia, for Appellants. Sharon L. Potter,
Assistant United States Attorney, Wheeling, West Virginia, for
Appellee. **ON BRIEF:** Marcia Gail Shein, LAW OFFICE OF MAR-
CIA G. SHEIN, P.C., Atlanta, Georgia, for Appellants. Melvin W.
Kahle, Jr., United States Attorney, Sam G. Nazzaro, Assistant United
States Attorney, Wheeling, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

___

## OPINION

PER CURIAM:

Frank and Linda Masiarczyk (Frank and Linda) were convicted by a jury in the United States District Court for the Northern District of West Virginia of conspiracy to defraud the United States by impairing and impeding the lawful function of the Internal Revenue Service (IRS) in the computation and assessment of taxes, pursuant to 18 U.S.C.A. § 371, and structuring financial transactions to avoid bank reporting requirements, pursuant to 31 U.S.C.A. § 5324. Frank also was convicted of willful tax evasion, pursuant to 26 U.S.C.A. § 7201. Frank and Linda argue on appeal that the district court should have granted their joint motion for judgment of acquittal based upon insufficiency of the evidence, that the district court erred in admitting and excluding certain evidence at trial, that the jury was not impartial, and that the Government violated their due process rights by relying upon false evidence. Linda also argues that the district court erred in enhancing her sentence because she was a leader, manager, or organizer under the Sentencing Guidelines. Finding no reversible error, we affirm.

I.

In 1981, Frank was convicted of misdemeanor tax charges arising from his failure to file personal income tax returns, corporate income tax returns, and quarterly employer returns. At the time, Frank lived in Florida with his then-wife, Linda, where they operated various car washes, adult entertainment clubs, and other businesses. In 1984, after the IRS filed various tax assessments against Frank, he signed a settlement decision in the United States Tax Court. Despite acknowledging that he owed taxes, however, Frank did not pay the taxes that he owed. Instead, Frank engaged in a scheme with Linda and others to conceal his income and assets in order to avoid paying the IRS.[1]

___

[1]Because this is a challenge to the denial of a motion for judgment of acquittal based upon insufficiency of the evidence, we view the evidence

Frank and Linda's scheme included cash purchases of various property in the names of others, including a purchase of 404 acres in Grantsville, West Virginia, and the purchase of a leasehold in Walton Beach, Florida. In addition, Frank divorced Linda in 1989, which permitted Frank to conceal his assets by placing them in Linda's name. Frank and Linda continued to represent to third parties that they were still married.

Frank and Linda's business interests included the ownership of corporate entities run by Frank that operated several adult entertainment clubs in West Virginia. Linda was an officer or employee of most of these corporations and handled all of the bookkeeping, while Frank operated and managed the clubs. These clubs paid their employees, including the managers, dancers, and bartenders, in cash. The clubs did not file W-2 forms or withhold taxes for any of their employees.

On October 9, 1997, Frank and Linda were named in a three-count indictment. Count One charged Frank and Linda with conspiring to defraud the United States by impairing and impeding the lawful function of the IRS in the computation and assessment of taxes pursuant to 18 U.S.C.A. § 371. Count Two charged Frank with willful tax evasion relating to taxes due and owing from previous years, pursuant to 26 U.S.C.A. § 7201. Count Three charged Frank and Linda with structuring financial transactions to avoid bank reporting requirements, pursuant to 31 U.S.C.A. § 5324.

On June 8, 1998, a jury trial commenced. At trial, the evidence showed that Frank and Linda had actively concealed substantial assets. For example, the evidence revealed that in March 1995, the IRS executed a search warrant at Frank and Linda's home and uncovered over $375,000 in cash that was hidden under a false floor in a safe. In addition, the evidence showed that Frank and Linda's monthly car and mortgage payments of over $2,500 totaled more annually than the combined gross income that they reported on their tax returns in the early 1990s. The evidence also disclosed that Frank called his daughter in Florida to ask her to retrieve business records

---

in the light most favorable to the Government. *See United States v. Sutton*, 961 F.2d 476, 478 (4th Cir. 1992).

from a warehouse to prevent the IRS from finding them. After his daughter refused to comply, Frank traveled to Florida, obtained the records, and discarded them in a trash can.

On July 23, 1998, the jury convicted Frank on all counts, and it convicted Linda on the counts involving her. On November 6, 1998, the district court denied their motion for judgment of acquittal or for a new trial. On April 26, 1999, Frank and Linda filed another motion for new trial based upon newly discovered evidence alleging that a juror was biased because he knew some of the Government witnesses and he had more serious tax problems than he had disclosed at voir dire. On July 8, 1999, after holding a hearing and taking testimony to determine whether Frank and Linda were denied a fair trial, the district court found no juror bias. On the same day, the district court sentenced Frank to eighty months imprisonment and Linda to fifty months imprisonment.

Frank and Linda raise several issues on appeal. First, they argue that the district court erred in denying their joint motion for judgment of acquittal because there was insufficient evidence to support their structuring convictions or Frank's tax evasion conviction. Second, they argue that the district court abused its discretion in admitting and excluding certain evidence. Third, they argue that they were denied a fair trial because the jury was not impartial. Fourth, they argue that the Government violated their due process rights by relying upon false evidence before the grand jury. Finally, they argue that the district court clearly erred in determining Linda's base offense level at sentencing by incorrectly finding that she was a leader, manager, or organizer in the criminal enterprise. We address each of these arguments, in turn.

II.

Frank and Linda first argue that the district court erred in denying their joint motion for judgment of acquittal based upon insufficiency of the evidence as to their structuring convictions, as well as Frank's individual conviction for willful tax evasion. In reviewing the denial of a motion for judgment of acquittal based upon insufficiency of the evidence, we must determine whether there is substantial evidence to support the jury's verdict, viewing the evidence in the light most

favorable to the Government. *See United States v. Sutton*, 961 F.2d 476, 478 (4th Cir. 1992); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) ("It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."). Substantial evidence is evidence that, when viewed in the light most favorable to the government, "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

### A.

We first address whether the Government offered sufficient evidence to support Frank and Linda's structuring convictions. Frank and Linda argue that there is insufficient evidence to show that either of them were aware of the currency transaction reporting (CTR) requirements of 31 U.S.C.A. § 5313, that either of them knew that structuring was unlawful, or that either of them knowingly and willfully evaded the CTR requirements in violation of 31 U.S.C.A. § 5324.

Domestic financial institutions must file CTRs for any transaction or series of transactions involving currency in an amount greater than $10,000. *See United States v. Beidler*, 110 F.3d 1064, 1065 (4th Cir. 1997). It is unlawful to structure, to assist in structuring, or to attempt to structure or to assist in structuring a currency transaction to avoid the reporting requirement. *See id.* at 1066. At the time of Frank and Linda's illegal conduct, "an individual could not be convicted of violating the antistructuring law absent proof that he did so 'willfully.'"[2]

---

[2]Prior to 1994, § 5322 provided that penalties could be imposed upon "'[a] person willfully violating' the antistructuring laws." *United States v. Beidler*, 110 F.3d 1064, 1066 (4th Cir. 1997) (quoting 31 U.S.C. § 5322 (1988)). The Supreme Court in *Ratzlaf v. United States*, 510 U.S. 135 (1994), held that the willfulness requirement of § 5322 required the Government to "prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 137. In 1994, Congress amended § 5322 to omit the willfulness requirement for violations of § 5324. *See Beidler*, 110 F.3d at 1066 n.1. It now provides, in pertinent part, that

*Id.* For the Government to show that a defendant acted "willfully" for this purpose, courts required proof that "the defendant acted with knowledge that the conduct was unlawful." *Id.* (internal quotation marks omitted). Thus, at the time of the offenses in this case, a conviction under § 5324 required that the Government show three things: (1) that the defendant structured or assisted in structuring currency transactions with one or more financial institutions; (2) that he did so for the purpose of evading the CTR requirements; (3) and that he acted with knowledge that his conduct was unlawful. *See id.* Although evidence that a defendant structured currency transactions, standing alone, is not sufficient to prove that the defendant knew that his conduct was illegal, *see Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *United States v. Ismail*, 97 F.3d 50, 56-58 (4th Cir. 1996), and although the "evidence must suggest knowledge of the antistructuring law as distinct from knowledge of financial institutions' reporting requirements," *Beidler*, 110 F.3d at 1068 (internal quotation marks omitted), we have held that "evidence that a defendant has structured currency transactions in a manner indicating a design to conceal the structuring activity itself, alone or in conjunction with other evidence of the defendant's state of mind, may support a conclusion that the defendant knew structuring was illegal," *id.* at 1069. Moreover, "because willfulness concerns the defendant's state of mind, which — unless the defendant admits to an intent to violate the law — can only be inferred from conduct," *id.*, the factfinder may draw reasonable

---

(a) A person willfully violating this subchapter or a regulation prescribed under this subchapter (*except section 5315 or 5324 of this title* or a regulation prescribed under section 5315 or 5324) shall be fined not more than $250,000, or imprisoned for not more than five years, or both.

(b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (*except section 5315 or 5324 of this title* or a regulation prescribed under section 5315 or 5324), while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, shall be fined not more than $500,000, imprisoned for not more than 10 years, or both.

31 U.S.C.A. § 5322 (West Supp. 2000) (emphasis added).

inferences from the available facts. Likewise, "willfulness may be inferred from evidence of attempts to conceal illegal conduct." *Id.*

In the present case, the Government presented evidence that on August 2, 1993, Frank and Linda arranged a transaction under which they distributed a total of $25,000 in cash to four relatives. Linda accompanied these relatives to the Calhoun County Bank, where each of the relatives used Frank and Linda's cash to purchase cashier's checks in their own names. Each cashier's check was for less than $10,000. These relatives did not keep the cashier's checks, but instead gave them back to Linda, who in turn used the five cashier's checks and cash as a partial payment for Frank and Linda's purchase of a club from Terry Shimbo. None of these relatives were involved in the transaction with Shimbo, and Shimbo did not recognize any of the names on the checks except Linda's.

Based upon the evidence presented at trial, a jury reasonably could have inferred that Frank and Linda structured this transaction to evade the CTR requirements. *See id.* The Government presented evidence, for example, that Frank was aware of the CTR requirements and intended to avoid them, including the testimony of Joe Anania, a former business partner, to "never draw out more than $10,000 because if you draw out more than $10,000 or more, then the bank has to report it." (J.A. at 661.)[3] The Government also presented the testimony of James Reed, a former employee, who stated that he would send Frank amounts ranging from $3,000 to $5,000 a week after paying the dancers and that "[s]ome banks would get curious and wonder why we was using all of this cash to come and get the cashier's checks," and that Frank told him to go to another bank if a bank asked any questions. (J.A. at 434.) Although Frank argues that Anania's testimony was "highly unreliable," and, therefore, that there was insuffi-

---

[3]The Government also offered a note from Frank to Anania that said "Joe, you should start taking out more money twice a week so it doesn't go over $10,000 at one time; and if you leave it in the bank, we are going to be sorry next year at tax time on the credit cards." (J.A. at 661.) Anania also testified that Frank wrote him a note asking him to "take some cash out of the bag before it sends up a red flag. We're putting in too much credit cards. We need to say that they are cash draws so they can tip the girls, if anyone asks." (J.A. at 659-60.)

cient evidence to support Frank's structuring conviction (Appellant's Br. at 16), we note that it is "[t]he jury, not the reviewing court, [that] weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *Beidler*, 110 F.3d at 1067 (internal quotation marks omitted).

Moreover, Linda accompanied the four relatives to the bank so that they could purchase a total of $25,000 in cashier's checks for Frank and Linda. In other words, Frank and Linda designed the Shimbo transaction in such a way that the relatives purchased more cashier's checks "than the minimum necessary to evade the reporting requirements." *Id.* at 1070. The jury could have inferred from the design of this transaction that Frank and Linda were attempting to conceal their structuring activity.[4] *See id.* Here, similar to *Beidler*, if Frank and Linda only had intended to avoid the filing of a CTR for the Shimbo transaction, as opposed to seeking to conceal their illegal structuring activity, they just as easily could have arranged for the purchase of only three cashier's checks, each at amounts just under $10,000, rather than arranging for the purchase of five cashier's checks at smaller amounts. In *Beidler*, this Court noted that "the jury reasonably could have inferred that Beidler intended to conceal his structuring because he knew structuring was illegal" based upon the fact that "Beidler made 34 cash deposits, totaling $116,500 at 10 different branches of three different banks. If Beidler's only intent was to avoid the filing of a CTR, 12 separate deposits would have served this purpose just as well." *Id.* Thus, the fact that Frank and Linda used more straw purchasers and cashier's checks than necessary raises the per-

---

[4]Frank and Linda argue that the Shimbo transaction does not give rise to a reasonable inference that Frank and Linda structured the transaction to evade the CTR requirements because they could have paid Shimbo $50,000 in cash rather than paying Shimbo $25,000 in cash and $25,000 through five cashier's checks. Had Frank and Linda not sought to evade the CTR requirements, however, they also could have used a single cashier's check rather than having the four relatives, who were each otherwise unrelated to the transaction, purchase checks for Frank and Linda. "Additionally, the jury — the sole judge of the credibility of the witnesses — was entitled to reject [Frank and Linda's] explanation of the transactions and to consider its rejection of [Frank and Linda's] story as positive evidence of [their] guilt." *United States v. Beidler*, 110 F.3d 1064, 1070 (4th Cir. 1997).

missible inference that they intended to conceal their structuring activity, and, therefore, that they were aware of the CTR requirements and the illegality of their structuring activity.[5] Accordingly, we affirm the district court's denial of Frank and Linda's motion for judgment of acquittal on their structuring convictions.

## B.  *Tax Evasion*

Frank argues that there was insufficient evidence to support his tax evasion conviction. In particular, he argues that although the indictment on this count alleged that his tax evasion began in 1981, the tax assessment did not become legally due until 1984, when he reached

---

[5]Linda argues, nevertheless, that even if the evidence shows that Frank had knowledge of the CTR requirements, there is no direct evidence that she had such knowledge. Although Linda is correct that the Government did not present any direct evidence that Linda, as opposed to Frank, knew of the CTR requirements, we have previously recognized that "[w]illfulness is rarely proven by direct evidence; rather, the factfinder must draw reasonable inferences from the available facts." *United States v. Beidler*, 110 F.3d 1064, 1069 (4th Cir. 1997) (internal quotation marks and alterations omitted). In other words, direct evidence of Linda's knowledge and state of mind is not required to support Linda's structuring conviction. *See id.* (noting that "willfulness concerns the defendant's state of mind, which — unless the defendant admits to an intent to violate the law — can only be inferred from conduct"). Here, Linda was not merely a passive participant in the Shimbo transaction. The evidence shows that Linda actively participated in, and, indeed, supervised, the Shimbo transaction by accompanying the relatives to the bank to purchase the cashier's checks for Frank and Linda. As with Frank, the evidence of Frank and Linda's attempt to conceal the structuring activity raises the permissible inference that Frank and Linda knew that structuring is illegal. *See id.* at 1070. Moreover, the Government presented other circumstantial evidence from which the jury could have inferred Linda's knowledge of the CTR requirements, including that Linda controlled the books and that Linda was at least aware, if not in control of, many of the financial decisions in Frank and Linda's business and thus was in a position to know of and participate in avoiding the CTR requirements. Based upon Linda's active participation in the concealment of the structuring, as well as her control over the financial aspects of the enterprise, the jury reasonably could have inferred that she, as well as Frank, willfully structured the Shimbo transaction.

a settlement with the IRS on his challenge.[6] Thus, Frank asserts, there was a prejudicial variance in the indictment that warrants reversal of his tax evasion conviction. The Government responds that it offered evidence of Frank's tax evasion dating back to 1981 and that even if the 1981 date is a variance, it is only a minor variance in light of the voluminous evidence regarding Frank's tax evasion after 1984. We affirm the district court because even if we assumed the correctness of Frank's premise — that "the tax assessments did not become legally due until after Appellant Frank had the opportunity to challenge them in tax court" (Appellant's Br. at 13) — Frank still cannot prevail because he cannot show that the alleged error in the indictment constitutes a fatal variance so as to warrant reversal of his conviction.

"When the government, through its presentation of evidence and/or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment — sometimes referred to as a fatal variance — occurs." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal citation omitted), *cert. denied*, *Randall v. United States*, 121 S. Ct. 248 (Oct. 2, 2000). "However, not all differences between an indictment and the proof offered at trial, rise to the 'fatal' level of a constructive amendment. When different evidence is presented at trial but the evidence does not alter the crime charged in the indictment, a mere variance occurs." *Id.* (internal citations omitted). "A mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *Id.* In other words, "[a] variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his 'substantial rights' and thereby resulted in actual prejudice." *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994) (internal citation omitted).[7]

---

[6]Although Frank argues in his brief that he did not challenge his tax assessment until 1985, the record discloses that he reached a settlement with the IRS in 1984.

[7]In the context of indictments that purportedly allege the wrong starting date for a conspiracy, for example, we have held that "the trier of fact

Frank's indictment charged that "[b]eginning in or about September 1981 up until March 1995," Frank deliberately concealed his assets to avoid paying taxes that he owed from 1974 to 1977. (J.A. at 56.) At trial, the Government offered evidence dating back to 1981 showing that Frank was aware that the IRS was seeking a civil judgment against him and that Frank made large purchases in cash. This evidence is consistent with the Government's argument that Frank deliberately was attempting to conceal his assets from the IRS. The Government also offered evidence that Frank concealed his assets after 1984 by means of large cash payments and purchases through corporate and third party names. For example, the Government offered evidence that Frank paid over $25,000 in cash to James Melton in 1989 to purchase property from Melton's employer and that Frank told Melton that "he didn't write checks. He had had a problem somewhere else before and didn't leave a paper trail for nobody." (J.A. at 979-83.) The Government also offered evidence of large cash payments for a dump truck, bulldozer, and contracting work in 1991 and 1992 and of payments for Frank's pool and garage in 1991 through 1994 that either were made in cash or paid by Frank's company, FJT Enterprises. There also was evidence that in 1997, Frank paid $25,000 for property that was deeded to Christopher Masiarczyk and Robert Balma.

In light of the evidence presented at trial concerning Frank's post-1984 tax evasion, we have no difficulty concluding that the jury had sufficient evidence from which to convict Frank of tax evasion, even if his tax assessment did not become legally due until after his 1984 settlement. Moreover, aside from bare conclusory allegations, Frank has failed to articulate, let alone show, any actual prejudice arising from the purported variance between the indictment and the actual

---

may find that the starting date of a conspiracy begins anytime in the time window alleged, so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." *United States v. Queen*, 132 F.3d 991, 999 (4th Cir. 1997) (rejecting appellant's argument that the district court erred in instructing the jury that it could find a conspiracy beginning anytime within or reasonably near the time window alleged in the indictment because "Queen was sufficiently on notice of both of the charges against him to enable him to defend himself effectively and to prevent reprosecution for the same offense").

evidence at trial. *See Randall*, 171 F.3d at 203. Accordingly, because the Government presented sufficient evidence of Frank's post-1984 tax evasion and because Frank cannot point to any prejudice if the indictment improperly included pre-1984 conduct, we conclude that the district court did not commit reversible error in denying Frank's motion for judgment of acquittal as to Frank's tax evasion count.

## III.

Frank and Linda next argue that the district court erred in admitting and excluding certain evidence at trial. In particular, Frank and Linda argue that a summary report detailing Frank and Linda's insurance payments for various vehicles should not have been admitted because the report contained inaccurate information and that the district court should not have admitted evidence of Frank's prior tax conviction because that evidence prejudiced Linda.[8] We review the district court's decision to admit or exclude evidence for abuse of discretion. *See United States v. Hassouneh*, 199 F.3d 175, 182 (4th Cir. 2000).

---

[8]Frank and Linda also argue that the district court erred in preventing them from offering tax returns from various corporations that they operated. The district court refused to admit these records because they were beyond the scope of direct examination. Frank and Linda did not attempt to introduce these records during their case-in-chief even though the district court explicitly left open that option. Frank and Linda also assert that the district court should not have admitted evidence showing their failure to withhold taxes for their dancers because, they argue, their dancers were independent contractors whose income was not subject to withholding. Even if Frank and Linda believed that the dancers were independent contractors, they still would have been required to file Form 1099s for the dancers if the dancers' income came into the corporation before being paid out. Frank and Linda also failed to withhold taxes for their managers and bartenders, who are not independent contractors. Because the evidence that Frank and Linda did not withhold taxes for their dancers was relevant to show a pattern of conduct and was consistent with their general failure to observe the tax laws with respect to their club employees, the district court did not abuse its discretion in admitting this evidence.

## A.  *Inaccurate Summary Report*

Frank and Linda argue that the district court abused its discretion in admitting a report that allegedly contained inaccuracies. The report in question — a summary report presented during the testimony of a State Farm Insurance representative to show that Frank and Linda paid $12,776.12 in insurance payments over four years for various insured vehicles — contained information relating to vehicles that were owned by Frank's father or that may have been leased. At trial, defense counsel objected to the report on the ground that "there are a number of inaccuracies in this thing based on my inspection of what she brought with her." (J.A. at 609.) The district court, noting that the inaccuracies would "go to the weight" rather than the "admissibility" and that defense counsel "can cross-examine [the witness] about it," (J.A. at 609-10), permitted the witness to testify about the summary. Defense counsel thereafter thoroughly cross-examined the witness as to the inaccuracies.

We agree with the district court that Frank and Linda's argument on this issue — that admission of the report prejudiced him because it contained inaccurate information — goes to weight rather than admissibility. *See United States v. Scholl*, 166 F.3d 964, 978-79 (9th Cir. 1999) (finding no abuse of discretion in admission of Market Analysis Center (MAC) reports because, among other reasons, "a party need not prove that business records are accurate before they are admitted" and "Scholl had the opportunity to attack the reliability of the MAC reports at trial and did so"), *cert. denied*, 528 U.S. 873 (Oct. 4, 1999); *United States v. Keplinger*, 776 F.2d 678, 694-95 (7th Cir. 1985) (finding no abuse of discretion because "[g]enerally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence"); *United States v. Smallwood*, 443 F.2d 535, 540 (8th Cir. 1971) ("The claimed error in the accuracy of the summaries was fully presented to the jury, and in our view the relatively few inaccuracies went to the weight of the evidence and not its admissibility."); *cf. United States v. Johnson*, 54 F.3d 1150, 1160-61 (4th Cir. 1995) (affirming admission of summary chart describing organization of drug conspiracy pursuant to Federal Rule of Evidence 611 because the summary chart aided the jury in ascertaining the truth and the district court minimized prejudice by, among other things, allowing extensive cross-examination

regarding the basis for the chart); *United States v. Bakker*, 925 F.2d 728, 736-37 (4th Cir. 1991) (affirming admission of composite tapes compiling excerpts of a longer broadcast pursuant to Federal Rule of Evidence 1006 and rejecting objection that the composite tapes were unrepresentative of the broadcasts because "Bakker's objection is misplaced because it goes to the weight to be accorded to the composite tapes, not their admissibility"). Accordingly, we affirm the district court's admission of the summary report.

### B.  *Prior Tax Evasion Conviction*

Frank and Linda next argue that admission of Frank's prior tax conviction had a prejudicial "spill-over" effect against Linda that allowed the jury to improperly infer her guilt "simply by her relationship with Appellant Frank." (Appellant's Br. at 27.) We conclude that admission of Frank's prior conviction for tax evasion is not a basis for reversal. First, defense counsel originally introduced this evidence, initially in an attempt to demonstrate that the IRS fraudulently obtained Frank's signature on the tax settlement, and then during the cross-examination of Timothy Ayers, a business partner of Frank and Linda's: "And you remember having a conversation with Frank . . . where he told you, many years ago even though he was innocent, that he was found guilty of a tax offense?" (J.A. at 816.) Second, the district court gave a specific limiting instruction to the jury on this evidence, instructing that Frank's prior conviction could be considered "only in determining whether [Frank] owed a tax debt as alleged in the indictment" and not "for any purpose, whatsoever, in deciding the government's case against [Linda]." (J.A. at 864-65.) Jurors, of course, are presumed to follow such cautionary instructions. *See United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998). The district court, therefore, did not abuse its discretion in admitting evidence of Frank's prior conviction.[9]

---

[9]Frank and Linda's argument could be construed as an argument in favor of severance. Federal Rule of Criminal Procedure 14 provides that "the court may . . . grant a severance of defendants" if "it appears that a defendant or the government is prejudiced by a joinder of . . . defendants . . . for trial together." Fed. R. Crim. P. 14. However, "[b]arring special circumstances, individuals indicted together should be tried together." *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981).

IV.

Frank and Linda next argue that the district court should have granted them a new trial because they discovered post-trial that a juror, Charles Olson, knew some of the Government witnesses and that Olson had more serious tax problems than he had revealed at voir dire. We review decisions regarding a motion for a new trial under the abuse of discretion standard. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) ("Generally, motions for a new trial are committed to the discretion of the district court.").

Frank and Linda allege that Olson "provided false information and/or withheld information during the voir dire which, if made known, would have warranted the exercise of a peremptory strike as to Olson, rather than on a different juror." (Appellant's Br. at 28.) At voir dire, Olson disclosed that the IRS had audited both him and his company, that penalties were assessed, and that corporate penalties were ongoing. When the district court asked whether any venire person or immediate family members "now have, or . . . presently anticipate having any case or dispute with or claim against the U.S.

---

In other words, there is a presumption that co-defendants indicted together will be tried together unless "a joint trial would be so unfairly prejudicial that a miscarriage of justice would result." *United States v. Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993). Thus, the mere fact that evidence against one or more defendants is stronger or more inflammatory than the evidence against other defendants does not warrant severance. *See United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996). Moreover, "[a] defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted). Even if the admission of Frank's prior conviction made Linda's defense more difficult, we cannot conclude that Linda has satisfied her burden of "demonstrating a strong showing of prejudice" arising from her joint trial with Frank. *Id.* Consequently, the district court did not abuse its discretion in denying Linda's motion for severance. *See United States v. Smith*, 44 F.3d 1259, 1267 (4th Cir. 1995) (stating that the grant or denial of a motion for severance is within the sound discretion of the district court).

Government," (J.A. at 203), no one responded, including Olson. The district court later recited a list of potential witnesses, and Olson responded that he knew a witness named Daqualante. He did not say that he knew Anania, Ayers, or IRS agent Ron Fluharty, who were on the list of witnesses. After trial and before sentencing, Frank and Linda filed a motion alleging that Olson had not been impartial. They based this motion upon statements by jury foreperson Lorrell Smith, who claimed that she had spoken with Olson after the verdict and that Olson told her that he knew Anania, that he could not believe that he was picked because he knew so many people in Calhoun County, that he knew now what Anania was doing, "and that he knew of Tim Ayers and had known of him for quite awhile." (J.A. at 2485-86.) The district court, after holding a hearing on this issue, found that "none of Mr. Olson's failures to respond were dishonest" and that "he was neither actually nor impliedly biased against these defendants." (J.A. at 2499.)

To obtain a new trial based upon a juror's responses to voir dire questions, Frank and Linda must demonstrate that the juror failed to answer honestly a material question and that a correct response would have provided a basis for a challenge for cause. *See Fitzgerald v. Greene*, 150 F.3d 357, 362 (4th Cir. 1998). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556. However, "[f]ailure to satisfy the requirements of *McDonough* does not end the court's inquiry . . . when the petitioner also asserts a general Sixth Amendment claim challenging the partiality of a juror based upon additional circumstances occurring outside the voir dire." *Fitzgerald*, 150 F.3d at 362-63. Rather, "regardless of whether a juror's answer is honest or dishonest, it remains within the trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or in exceptional circumstances, that the facts are such that bias can be inferred." *Id.* Implied bias "is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Id.* at 365 (internal quotation marks omitted).

In the present case, the district court applied the *McDonough* standards at the post-trial hearing and found that Olson had not been dishonest and that Olson was not actually or impliedly biased against Frank and Linda. The record supports the district court's findings. First, Olson testified at the post-trial hearing that he knew an IRS agent named Ron Fluharty, but that he was "quite sure" that the IRS agent named Ron Fluharty who testified was "not the same one." (J.A. at 2423.) Second, he testified that he knew *of* Ayers, but did not know him and had never talked to him; notably, the district court phrased its voir dire question as whether the venire members *knew* potential witnesses such as Ayers. Moreover, to the extent that Olson expressed an opinion of Ayers to Smith, he told Smith that he thought Ayers may have been incompetent. Third, although Frank and Linda argue that Olson failed to disclose the full extent of his tax problems at voir dire, the district court found that he had fully disclosed his tax problems in his jury questionnaire, and the record reveals that Olson addressed the relevant details of his tax problems at voir dire, disclosing that he and his corporation had been audited, that he had paid penalties, and that his corporate penalties were ongoing.

As to Anania, Olson testified at the post-trial hearing that he knew Anania, but only under the name of "Joe Anney." (J.A. at 2428.) He testified that he grew up with Anney and went to school with him about fifty years ago, but that he had not seen him in twenty to twenty-five years. He stated that he had heard about Anney through press clippings about Anney's clubs throughout the years but that he did not recognize Anania at the time of voir dire, nor did he immediately recognize Anania as Anney when Anania testified because "[h]e didn't look anything like he did the last time [Olson] saw him." (J.A. at 2444.) Olson did eventually recognize Anania during Anania's testimony, but Olson did not inform the district court because he did not think it was important. Olson stated that he did not give Anania any more credibility than he otherwise would have had he not known him, and, in fact, Olson testified that he did not believe Anania very much at all.

It is true that Olson actually knew Anania, albeit decades ago, and that Olson did not disclose his relationship with Anania after realizing that Anania was the same man he had known fifty years ago in school. And, Olson's explanation that he did not realize that Anania

was Anney is arguably undermined by the fact that Olson testified that he had kept up with Anney through news clippings that he had seen throughout the years. The district court, however, had the opportunity to see Olson and Smith firsthand and to judge their credibility, and it explicitly found that Olson was not dishonest and that his explanations were reasonable. There is no evidence as to whether the press clippings to which Olson referred involved "Joe Anney" or "Joe Anania" and, thus, Olson's recollection of the news clippings does not necessarily undermine Olson's credibility. Consequently, Olson's explanation is not implausible. Indeed, Olson explicitly stated that he did not give Anania's testimony any extra weight or much weight at all, and that his relationship with Anania did not affect his ability to judge the case. In light of these facts, and absent a showing of actual or implied bias on the part of Olson, we cannot conclude that the district court abused its discretion in denying a new trial based upon Olson's nondisclosures. *See Fitzgerald*, 150 F.3d at 364 (finding no bias where district court properly held a hearing and the juror "unequivocally stated . . . that his granddaughter's molestation [which he had not disclosed at voir dire] had no effect on his voting to convict or sentence Fitzgerald for any of his crimes").

V.

Frank and Linda next argue that their constitutional rights were violated when a Government witness, Agent Harper, gave false evidence before the grand jury through her testimony. Because Frank and Linda did not raise this argument before the district court, we review this claim for plain error.[10] *See United States v. Hawkins*, 76

---

[10]Frank and Linda submit that the standard of review is de novo because "this represent[s] a claim of a constitutional violation, through prejudicial misconduct on the part of the government." (Appellant's Br. at 34.) We disagree. *See United States v. Ferguson*, 211 F.3d 878, 886 (5th Cir. 2000) (reviewing allegation of constitutional error for plain error because Ferguson did not raise the issue below), *cert. denied*, 121 S. Ct. 258 (Oct. 2, 2000); *United States v. Means*, 133 F.3d 444, 447 (6th Cir. 1998) ("The defendant raises a constitutional challenge to his conviction, which, as a question of law, we generally would review de novo. However, . . . this issue was never raised in the district court. The usual rule in this court is that such a failure precludes this court's consideration of the issue on appeal." (internal citation omitted)).

F.3d 545, 552 (4th Cir. 1996). "[W]e may only reverse a conviction for plain error if the defendant establishes the following: (1) that an error occurred, (2) that it is plain, and (3) that the error affected his substantial rights." *United States v. Richardson*, ___ F.3d ___, No. 97-4101, 2000 WL 1729654, at *4 (4th Cir. Nov. 22, 2000). "Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks and alterations omitted).

Paragraph 38 of the indictment describes as an overt act of the conspiracy that "[o]n or about August 13, 1995," Frank "burned records subject to discovery by federal agents with the Internal Revenue Service, who were in Pensacola at the time." (J.A. at 54.) Frank and Linda argue that the basis for this information — the grand jury testimony of Harper — was false because Harper had no actual knowledge of this incident and, instead, relied upon second-hand information that Harper did not verify. Frank and Linda argue that other agents who were in Pensacola and who would have seen the burning of these records, had it actually occurred, never mentioned it, and, therefore, Harper's testimony that Frank burned the records must be false. At trial, Harper conceded that she did not witness the burning of documents and that the burning of documents was not mentioned by detectives at the scene. She stated that she told the grand jury about the burning of documents because "[t]hat's what [she] believed happened" based upon what she heard from Detective Mike Simmons, who apparently was not at the scene.[11] (J.A. at 1756.)

"Relief from an erroneous indictment after a case has been decided by a petit jury is rarely granted." *United States v. McDonald*, 61 F.3d

---

[11]As evidence of "Agent Harper's propensity in submitting false statements in order to get what she wants," (Reply Br. at 17), Frank and Linda point to Harper's testimony conceding that she was not on the scene where various evidence was seized even though she swore to the magistrate when she returned various property that she was the one who actually took the items. Harper testified that she did not seize the evidence but that she swore that she had "[b]ecause the seizing officer took it and gave the evidence to [her]." (J.A. at 1761.)

248, 252 (4th Cir. 1995), *overruled on other grounds by United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000). "Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." *Id.* (internal quotation marks omitted). Consequently, "[w]e will not hear a challenge to the reliability or competence of the evidence presented to the grand jury, and the mere fact that evidence itself is unreliable is not sufficient to require dismissal of the indictment." *Id.* (internal quotation marks omitted). In *United States v. Mechanik*, 475 U.S. 66 (1986), the Supreme Court addressed whether the joint testimony of witnesses before the grand jury, in violation of Fed. R. Crim. P. 6(d), warranted reversal of a conviction even though the trial jury found the defendants guilty beyond a reasonable doubt. The Court assumed that the joint testimony before the grand jury was improper but concluded that "the supervening jury verdict made reversal of the conviction and dismissal of the indictment inappropriate." *Id.* at 70. The Court stated that "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.*

Applying these standards to this case, we conclude that even if Harper's grand jury testimony was inaccurate or false, that falsity provides no basis for reversing Frank and Linda's convictions. First, although Frank and Linda assert that Harper's false grand jury testimony unduly prejudiced them, defense counsel thoroughly cross-examined Harper at trial on this issue. Second, even if Harper's grand jury testimony entirely relied upon second-hand information, grand jury testimony can be based upon hearsay. *See Costello v. United States*, 350 U.S. 359, 363-64 (1956) (rejecting the argument that a grand jury may not rely on hearsay evidence); *see also United States v. Newcomb*, 488 F.2d 190, 192 (5th Cir. 1974) (stating that "an indictment based exclusively on hearsay evidence is not constitutionally invalid and . . . a defendant is not entitled to litigate the sufficiency of the evidence presented to the grand jury"). Third, because the petit jury subsequently convicted Frank and Linda beyond a reasonable doubt, any error in their grand jury proceedings is harmless.

*See Mechanik*, 475 U.S. at 73 (stating that the "petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation"); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (stating that an indictment may be quashed because of prosecutorial misconduct only where the improper conduct "substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations" (internal quotation marks omitted)); *United States v. Colon-Munoz*, 192 F.3d 210, 218-19 (1st Cir. 1999) (relying upon *Mechanik* and stating that "any error in the charging decision of the grand jury was rendered harmless by the verdict and Colon cannot claim that [the presence of Gil, the interim U.S. Attorney who may not have been properly appointed] before the grand jury entitles him to a dismissal of the indictment."), *cert. denied*, 120 S. Ct. 1559 (Apr. 3, 2000). We conclude, therefore, that even if Harper lied before the grand jury, Frank and Linda have nevertheless failed to establish a sufficient basis to reverse their convictions.

## VI.

Finally, Linda argues that the district court erred in finding that Linda's role in the offense warranted a four-point enhancement because she was not an organizer or leader in the criminal activity. We review the district court's application of a role enhancement for clear error. *See United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir. 1990) ("The trial court's determination that the defendant played an aggravating role in the offense is essentially factual and therefore is subject to the 'clearly erroneous' standard of review." (internal citations omitted)).

Section 3B1.1 of the Sentencing Guidelines provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."[12] U.S.S.G. § 3B1.1(a) (1998). The application note states that

---

[12]Linda does not argue that the criminal activity involved fewer than five individuals.

> [t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1(a) comment. (n.2). In determining whether a defendant qualifies for this adjustment, we look to several factors: (1) the exercise of decision making authority; (2) the nature and participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *See* U.S.S.G. § 3B1.1 comment. (n.4). The district court found that

> [t]he business enterprise here of running these clubs was run by [Frank and Linda] and they had very different roles. To call [Linda] a mere bookkeeper underrates her abilities and her position within the structure of this criminal activity. She kept these books and kept them in a manner that would assist the defendants in preventing the IRS from being able to discover that they were, in fact, living as a married couple in West Virginia operating these clubs . . . [and also notable was] the fact that the money was kept at the house in cash. Her role was extremely significant and amounted to a management or leadership position when you consider that she was, in fact, a business partner with some of the other participants in this criminal activity, that she had a right to a larger share of the fruits of the crime here, and that she was exerting control and authority over those to whom she provided financial records pertaining to their income.

(J.A. at 2614.) Accordingly, the district court increased Linda's offense level by four levels, and she was sentenced to fifty months imprisonment on each count, to be served concurrently.

There was evidence to support the district court's conclusion that Linda had a leadership position in the criminal activity that substantially related to Frank and Linda's various financial transactions. For example, Frank testified that Linda controlled the books and that she, rather than he, knew how much money the clubs brought in every year. Frank's testimony established that Linda's involvement in their financial endeavors was more than as a passive bookkepper. Frank testified, for example, that "I let Linda take care of the bills, and I have spending money in my pocket" (J.A. at 1998), and that he had no recollection of certain IRS collection notices because "[w]hen I'd get this kind of stuff, I'd just give them to Linda." (J.A. at 1949.) Frank's testimony supports the conclusion that Linda "exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1(a) comment. (n.2). Although Linda argues that she was a mere bookkeeper, the district court explicitly found that she was more than that, and that Frank left "all of the business and financial aspects of the enterprise to [Linda] and that she kept the books." (J.A. at 2615.) In light of the evidence, we cannot conclude that the district court clearly erred in its finding that Linda played a "leadership role" sufficient to warrant a three-level enhancement.

## VII.

In conclusion, the district court did not commit reversible error in denying Frank and Linda's motions for judgment of acquittal based upon insufficiency of the evidence, denying and excluding certain evidence at trial, rejecting Frank and Linda's bid for a new trial based upon juror partiality, denying Frank and Linda's due process challenge based upon allegedly false evidence presented to the grand jury, and enhancing Linda's sentence because she was a leader, manager, or organizer in the criminal enterprise. We, therefore, affirm Frank and Linda's convictions and Linda's sentence.

*AFFIRMED*