**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 11-4791**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARTIN TERAN, a/k/a El Chapin, a/k/a Daniel R. Rodriguez,
a/k/a David L. Morales Garcia, a/k/a Hugo Rolland Gomez,

Defendant - Appellant.

─────────────

**No. 11-4844**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSUE BENITEZ, a/k/a Beecho,

Defendant - Appellant.

─────────────

Appeals from the United States District Court for the District
of South Carolina, at Columbia. Joseph F. Anderson, Jr.,
District Judge. (3:10-cr-00468-JFA-1; 3:10-cr-00468-JFA-2)

─────────────

Argued: September 20, 2012      Decided: November 1, 2012

─────────────

Before KING, GREGORY, and WYNN, Circuit Judges.

─────────────

Affirmed by unpublished opinion.  Judge Gregory wrote the opinion, in which Judge King and Judge Wynn joined.

———————————

**ARGUED:** Joshua Snow Kendrick, Columbia, South Carolina; Jonathan McKey Milling, MILLING LAW FIRM, LLC, Columbia, South Carolina, for Appellants.  Julius Ness Richardson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.  **ON BRIEF:** William N. Nettles, United States Attorney, Columbia, South Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

A federal jury convicted Appellants Martin Teran and Josue Benitez on seven counts stemming from a murder-for-hire scheme. Appellants argue that the verdict should be vacated because the district court made a number of grave evidentiary errors. Appellant Teran further argues that the district court erred in denying his motion for acquittal on two firearms charges. Reviewing Appellants' numerous claims, we find each to be without merit. Moreover, there was substantial evidence to support Appellants' convictions on all seven counts, rendering any error made by the district court harmless. For the reasons below, we affirm.

I.

One night in 2008, Appellants Martin Teran and Josue Benitez met in Houston, Texas, at the after-hours bar "Los Ranchos." A Los Ranchos bouncer, Luis Sandoval, overheard Teran recruit Benitez for a "hit." Someone from Honduras had offered Teran $40,000 to kill a man later identified as Jorge Ramos. Teran offered Benitez $5,000 from the pot to shoot Ramos and said he would supply the gun. Benitez agreed. Teran then realized Sandoval overheard the entire conversation, and gestured to him that he better not tell anyone what he heard.

On October 30, 2008, after the agreement was made, cellphone records placed Teran and Benitez leaving Houston and arriving in Columbia, South Carolina, a day later. Upon arrival, Teran and Benitez checked into a local hotel and later that day purchased a distinctive green pick-up truck with a white door.

On November 2, 2008, in Columbia, South Carolina, Jorge Ramos was fatally shot in front of his trailer. A witness identified Benitez as running from behind Ramos's trailer with a gun. Other witnesses observed a green pick-up truck with a white door speeding away from Ramos's trailer. Teran and Benitez checked out of the hotel the same day, and according to cellphone records, left South Carolina and returned to Texas.

Back at Los Ranchos, on November 14, 2008, Sandoval called law enforcement to inform them that he heard Benitez bragging about a murder. In the course of bragging, Benitez provided a number of fact-specific details about the murder. Sandoval also told law enforcement that he observed Benitez with a firearm. As a result of this information, Officers Moore and Vogelpohl established surveillance outside the bar. After Los Ranchos closed for the night, the officers witnessed Benitez getting into the passenger seat of a white Jeep that drove away.

Officers Moore and Vogelpohl followed the Jeep and pulled it over after observing it cross the center lane twice. Officer

Vogelpohl approached the passenger side where Benitez was sitting, and smelled marijuana as Benitez rolled down the window. He asked Benitez to produce identification, which Benitez could not do. Officer Vogelpohl ordered Benitez out of the car, at which point the smell of marijuana became more pronounced. Benitez made a movement towards his back pocket and Officer Vogelpohl stopped him, believing he may have had a gun. He handcuffed Benitez and patted him down, discovering a bag of marijuana in Benitez's back-pocket. Benitez was arrested, and Officer Moore searched the passenger area of the car. In the course of the search, he discovered a Beretta .380 pistol. Subsequent ballistic reports determined it was the same gun used to kill Ramos. Three days later, Teran was apprehended.

In post-Miranda statements, both Benitez and Teran discussed the killing of Ramos, corroborating a number of details about the murder. Benitez said, among other things, that he was familiar with the green truck with the white door. He explained that he and Teran left from Houston to South Carolina, where they checked into a hotel, and later went looking for a man in a trailer park. Teran said that he also knew about the green and white truck, that he heard the gunshots, and was on the phone with the get-away driver at the time of the murder.

Around December 8, 2008, Teran and Benitez were extradited by commercial airline to South Carolina. During a flight delay, a transporting officer asked Teran if he was a member of the gang MS-13. Teran initially responded no, but when asked again, responded affirmatively.

While in pretrial custody in South Carolina, Teran discussed his gang-membership and Ramos' murder with his cellmate. In a particularly loquacious moment, he told his cellmate that his "brother" had been caught with the murder weapon and that he was present at the scene when Ramos was shot; although he was not the shooter. Teran also declared he did not want to spend life in prison for a crime he was paid to commit.

Before trial, prison officials intercepted a coded letter from Teran addressed to Benitez. A second coded letter from Teran to Benitez was found in Benitez's cell. The letters were decoded by an FBI Cryptologist. The most scandalous parts read: "I'm doing everything possible so that [expletive] 'Luis' [Sandoval] won't come to testify against you . . . My attorneys say that he is the 'confidential informant' . . . I already sent a message to [our associates] to take care of Luis [Sandoval]." Three days after the letters were intercepted, Sandoval received threatening text messages in which he was referred to as a "snitch."

6

Appellants originally faced state murder charges in South Carolina. A federal indictment was then filed against Teran and Benitez on April 21, 2010. A superseding indictment was filed December 21, 2010. Teran and Benitez were charged with traveling in interstate commerce to commit a murder for hire (Count 1), 18 U.S.C. § 1958; use of a firearm in relation to a crime of violence or drug trafficking offense (Count 2), 18 U.S.C. § 924(c); being illegal aliens in possession of a firearm (Count 3), 18 U.S.C. § 922(g)(5)(A); and illegal reentry into the United States after being deported (Counts 4 and 5), 8 U.S.C. § 1326. Teran was also charged with witness tampering (Count 6) and obstruction of justice (Count 7). 18 U.S.C. §§ 1503, 1512. On January 6, 2011, Teran and Benitez entered not guilty pleas to all seven charges, and trial began January 25, 2011. On February 10, 2011, a federal jury found Teran and Benitez guilty on all counts, and the district judge sentenced Teran and Benitez to life in prison on August 3, 2011.

## II.

Appellants first argue that evidence used at trial was obtained in violation of their constitutional rights and therefore should have been suppressed. Specifically, Benitez argues that the gun entered into evidence was found as a result of an illegal search in violation of his Fourth Amendment

7

rights; Teran argues that the admission of Benitez's statement in which his name was redacted violated his Sixth Amendment Confrontation Clause rights; Appellants both argue the government violated their Due Process rights by not investigating the owner of the cellphone number from which text messages were entered into evidence; and Teran argues his un-Mirandized statement that he is a member of MS-13 was taken in violation of his Fifth Amendment rights.

We review the district court's factual findings for clear error and legal conclusions de novo. United States v. Vankesteren, 553 F.3d 286, 288 (4th Cir. 2009). Applying this standard of review, we find Appellants' arguments unavailing.

## A.

Benitez argues that the search of the car in which he was a passenger violated his Fourth Amendment rights, and therefore the gun discovered therefrom should have been suppressed.

We have repeatedly held that if an officer smells marijuana upon a lawful traffic stop he has probable cause to search both the suspect and the passenger area of the car. See United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002); United States v. Haley, 669 F.2d 201, 203 (4th Cir. 1982). Appellants do not dispute the legality of the traffic stop. Once Officer Vogelpohl smelled marijuana, therefore, he had probable cause to search both Benitez's person and the passenger-area of the

8

vehicle for contraband. Thus, the search of Benitez and the car and the subsequent discovery of the gun were lawful.

## B.

Teran contends that the district court violated his Sixth Amendment Confrontation Clause rights by admitting a sanitized version of Benitez's statement in which his name was replaced with "the other person."

Our precedent is unambiguous in that statements redacting a co-defendant's name are constitutionally permissible. See United States v. Lighty, 616 F.3d 321, 350 (4th Cir. 2010); United States v. Akinkoye, 185 F.3d 192, 198 (4th Cir. 1999); United States v. Vogt, 910 F.2d 1184, 1191-92 (4th Cir. 1990). Even if one can read the redacted statement in light of other evidence as implicating a defendant, this does not violate the Confrontation Clause. See United States v. Glisson, 460 F. App'x 259, 263 (4th Cir. 2012) (per curiam). Teran's Sixth Amendment rights were not violated by the admission of Benitez's statement.

## C.

Appellants allege the government violated its constitutional duty as articulated in Brady v. Maryland, 373 U.S. 83 (1963), when it did not employ all available investigative techniques to discover the owner of a cellphone number from which text messages were entered into evidence.

9

The Supreme Court has held there is no Due Process violation simply because "the police fail to use a particular investigatory tool," as the "police do not have a constitutional duty to perform any particular tests." Arizona v. Youngblood, 488 U.S. 51, 58-59 (1988). Furthermore, we have held that Brady does not apply to evidence that is "available to the defendant from other sources." United States v. Bros. Constr. Co. of Ohio, 219 F.3d 300, 316 (4th Cir. 2000) (quoting United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990)). The text messages in question were disclosed to Appellants and Appellants were then able to subpoena the phone records. Because Appellants were able to employ their own investigatory techniques to determine the owner of the cellphone number, no constitutional violation occurred.

### D.

Teran also claims the un-Mirandized statement he made to law enforcement that he is a member of MS-13 was a result of custodial interrogation in violation of his Fifth Amendment rights, and therefore should have been suppressed. Whether Teran was subject to custodial interrogation raises two questions of first impression in this Circuit not fully briefed by either party. One, whether the rule announced in Howes v. Fields, 132 S.Ct. 1181 (2012), that inmates are not in constant custody for Miranda purposes applies to pre-conviction

10

detainees.  See also United States v. Conley, 779 F.2d 970 (4th Cir. 1985); United States v. Cooper, 800 F.2d 412 (4th Cir. 1986).  And two, whether routine booking questions that also incriminate the defendant fall under the 'booking question' exception to Miranda.  See United States v. D'Anjou, 16 F.3d 604, 608-09 (4th Cir. 1994).  We do not reach these questions, however, as Teran's statement was admissible under the independent source doctrine.

It is well established that the "independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443 (1984).  While normally applied in the Fourth Amendment context, the independent source doctrine applies in equal force to Fifth Amendment violations. See id. at 442 n.3; Murphy v. Waterfront Comm'n of New York Harbor, 378 U.S. 52, 79 (1964); Kastigar v. United States, 406 U.S. 441, 460-61 (1972); see also United States v. Patane, 542 U.S. 630, 639 (2004) ("[T]he Miranda rule does not require that the statements [taken without complying with the rule] . . . be discarded as inherently tainted." (internal quotation marks and citation omitted)).

Here, Teran's gang affiliation was clearly available from other sources.  Sandoval testified that Teran was a member of MS-13.  Beyond this, Teran willfully admitted to his cellmate

11

that he was a member of the gang. "The independent source doctrine permits the introduction of evidence initially discovered during, or as a result of, illegal government conduct, but later obtained independently, from lawful activities untainted by the initial illegality." United States v. Rodriquez-Morales, 972 F.2d 343, 1992 WL 175969, at *3 (4th Cir. 1992) (unpublished per curiam) (citing Murray v. United States, 487 U.S. 533 (1988)). Because evidence of Teran's gang membership was available from multiple independent sources, the district court did not err in admitting Teran's own statement, even assuming it was taken in violation of his Fifth Amendment rights.

## III.

Appellants next challenge the district court's admission of several pieces of evidence. We review a district court's evidentiary rulings for abuse of discretion. United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). Because we find no abuse of discretion here, Appellants' arguments can be dispatched of summarily.

### A.

Appellants assert that the district court erred in admitting evidence of threatening text messages received by

12

Sandoval. They argue that the messages were irrelevant, unauthenticated, and highly prejudicial.

The messages in question were undoubtedly relevant. Law enforcement intercepted a letter from Teran stating he was trying to prevent Sandoval from testifying at trial. It is reasonable to infer that threatening text messages sent to Sandoval in close proximity to the interception of this letter were related. Likewise, the messages were properly authenticated, as authentication only requires a jury to make a "factual determination of whether the evidence is that which the proponent claims." United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009) (internal quotation marks omitted). Sandoval testified as to the personal nature of the messages, including the threats to his family and how they aligned with Teran's knowledge of his family. A reasonable juror could infer that the text messages were sent by Teran (or an associate), as authentication only requires proof "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Finally, the text messages were highly probative, as they corroborated the letters sent by Teran. The district court did not abuse its discretion by admitting the text messages.

Appellants also maintain that evidence of their membership in MS-13 was inadmissible as it is irrelevant and highly prejudicial.

As the crime in question was a murder-for-hire, Appellants' gang membership gave rise to the motive for the killing and formed the basis for their relationship. As our sister Circuit wisely explained, admission of gang-related evidence is appropriate "to demonstrate the existence of a joint venture or conspiracy and a relationship among its members." See United States v. King, 627 F.3d 641, 649 (7th Cir. 2010) (internal quotation marks omitted). Furthermore, the district court limited gang testimony to issues relevant to the case, ensuring that the evidence of gang membership was no more sensational than the crime in question. See United States v. Boyd, 53 F.3d 631, 637 (4th Cir. 1995) ("[T]he balancing test undeniably weighs in favor of admitting the evidence, because the evidence . . . did not involve conduct any more sensational or disturbing than the crimes with which he was charged."). Evidence of Appellants' gang membership was properly admitted.

Appellants' argument that the gang expert's testimony was prejudicial is also fruitless. The district court reviewed and sanitized the expert testimony outside the presence of the jury. The district court then made a cautious assessment that the

expert testimony would be useful in clarifying events for the jury, corroborating witness statements, and identifying Appellants' gang tattoos.

In short, the district court made a deliberate, well-reasoned determination as to the relevance of both Appellants' gang membership and the use of expert testimony. We do not find this to be clear error.[*]

IV.

Finally, Teran makes a last-ditch attempt for reprieve, arguing he should have been acquitted of his firearms convictions under 18 U.S.C. § 924(c) (use of a firearm in

---

[*] Appellants also take issue with the admission of Bureau of Alcohol, Tobacco and Firearms (ATF) documents, Teran's prior gun charge, and Teran's wife's translated prior inconsistent statement. These arguments hold no water. The ATF forms are admissible business records under Federal Rule of Evidence 803(6). Federal regulation requires firearm dealers to fill out a Form 4473 for every firearm transaction, and then submit the forms to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). See 27 C.F.R. §§ 478.124, 478.127. Teran's prior firearms conviction is admissible under the "intent" exception to bad character evidence. See Fed R. Evid. 404(b). Because Teran pled not-guilty to possession of a firearm, any past firearm conviction was relevant as to his intent. See United States v. Brown, 398 F. App'x 915, 917 (4th Cir. 2010) (per curiam). And just because Teran's wife's statement needed to be translated does not render the statement inadmissible, as we have stated that, "except in unusual circumstances an interpreter is no more than a language conduit and therefore his translation do[es] not create an additional level of hearsay." Vidacak, 553 F.3d at 352 (internal quotation marks and citation omitted). There is nothing in the record that indicates the interpreter was anything more than a conduit.

15

relation to a crime of violence or drug trafficking offense) and 18 U.S.C. § 922(g)(5)(A) (illegal alien in possession of a firearm). Teran contends there was insufficient evidence for a jury to conclude he actually possessed the murder weapon.

When reviewing a district court's denial of a motion for judgment of acquittal based upon insufficiency of the evidence, "[w]e must determine whether there is substantial evidence to support the jury's verdict, viewing the evidence in the light most favorable to the government." United States v. Masiarczyk, 1 Fed. App'x 199, 203 (4th Cir. 2001) (citing United States v. Sutton, 961 F.2d 476, 478 (4th Cir. 1992)). The record at hand contains more than enough evidence to sustain Teran's firearms convictions, rendering his argument feckless.

## A.

While the government may not have eyewitness testimony placing the gun in Teran's hands, there is certainly enough evidence for a reasonable person to make that inferential leap. Sandoval testified that he overheard Teran agreeing to provide the gun. Further, a jury could infer Teran had constructive possession of the gun, as he coordinated the murder-for-hire scheme. Finally, the jury could have found Teran guilty under the Pinkerton co-conspirator liability theory; because Benitez is guilty of the crime, so is Teran. See United States v. Chorman, 910 F.2d 102, 110-11 (4th Cir. 1990) ("Federal courts

16

consistently have followed <u>Pinkerton</u> in affirming convictions for substantive offenses committed in the course of and in furtherance of a conspiracy, based on the defendant's knowledge of and participation in that conspiracy."); <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946). A defendant can be found guilty of an offense "reasonably foreseeable as a necessary or natural consequence of the conspiratorial agreement." <u>United States v. Aramony</u>, 88 F.3d 1369, 1380 (4th Cir. 1996) (internal quotation marks omitted). It is undoubtedly foreseeable that Teran can be found guilty under <u>Pinkerton</u> liability theory for possession of a firearm, as the gun was the very object used to perpetrate the conspiracy in question. There is enough evidence to support Teran's firearms convictions under multiple theories, thus the district court did not err in denying Teran's motion of acquittal.

## V.

Ultimately, this Court will only overturn a jury verdict in the rarest of circumstance. "We will not [] disturb a jury verdict 'unless, without weighing the evidence or assessing witness credibility, we conclude that reasonable people could have returned a verdict' only for the moving party." <u>Randall v. Prince George's County, Md.</u>, 302 F.3d 188, 201 (4th Cir. 2002) (citing <u>Cooper v. Dyke</u>, 814 F.2d 941, 944 (4th Cir. 1987)).

17

Even assuming Appellants' assertions of error are true, there is still overwhelming evidence on the record to support the jury's verdict, rendering any error made by the district court harmless.

VI.

For the foregoing reasons, we affirm Appellants' convictions on all seven counts.

AFFIRMED