UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

JAMES H. MASON,
  *Defendant-Appellant.*

}

No. 01-4055

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Joseph F. Anderson, Jr., Chief District Judge.
(CR-99-231)

Argued: January 25, 2002

Decided: June 3, 2002

Before WILKINSON, Chief Judge, and WILKINS and MICHAEL,
Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Katherine Elaine Evatt, Assistant Federal Public
Defender, Columbia, South Carolina, for Appellant. Eric William
Ruschky, Assistant United States Attorney, Columbia, South Caro-
lina, for Appellee. **ON BRIEF:** Scott N. Schools, United States Attor-
ney, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

James H. Mason was tried and convicted by a jury on one count of wire fraud in violation of 18 U.S.C. § 1343. The jury found that Mason and his co-defendant, William Carlton Lawson, had devised a scheme to defraud Gibbs Special Assets (GSA) by inducing GSA to wire them $768,150 in payment for 2,430 bales of cotton that Mason's company (Performance Cotton Co.) had supposedly purchased from Lawson's company (Cochran Bonded Warehouse). Mason appeals his conviction primarily on the grounds that there was insufficient evidence to support the jury's verdict and that the government's evidence at trial constructively amended the indictment, thereby violating his Fifth Amendment rights. Mason also argues that the district court abused its discretion in denying his motion for a new trial and in ordering him to pay $30,000 in restitution. Finding no error in the district court's handling of the case, we affirm.

I.

The facts relevant to Mason's wire fraud conviction (Count One of the indictment) are as follows. Mason was a cotton broker in Fort Mill, South Carolina, who did business as Performance Cotton Co. (Performance). In the summer of 1994 Mason's friend, Glen Reid, negotiated a business agreement between Performance and Jimmy I. Gibbs, a wealthy businessman from Spartanburg, South Carolina, who was the sole owner of Gibbs Special Assets, Inc. (GSA). Though the details of this agreement changed over time and were the subject of some dispute at trial, the essential thrust was that Performance arranged transactions between cotton suppliers and textile mills and GSA financed these transactions. Reid earned commissions paid by Performance for each transaction financed by GSA. Reid never told Gibbs that Mason was the owner of Performance. Instead, Reid spoke of Performance as being run by Mike Campbell, Mason's brother-in-law and Performance's sole employee.

Initially, Gibbs financed only 90-bale truckloads of cotton and received $500 profit per truckload in return for his investment. Reid and Gibbs testified that Performance would arrange contracts to sell cotton to textile mills at specified prices and would then locate cotton that it could buy at specified prices to fulfill these contracts. Reid then presented Gibbs with the terms of the proposed transactions, and Gibbs decided on a case-by-case basis whether to finance the transactions. If Gibbs chose to go forward with a proposed transaction, he would pay the cotton suppliers directly, and the textile mills would send payment to Gibbs after receiving delivery of their cotton from Performance. Gibbs would then deduct his cost of purchasing the cotton plus $500 and would forward the remaining money to Performance. Gibbs testified that the cotton shipped to mills by Performance belonged to him because he was the person who had paid for it.

In a September 1994 meeting, Reid, Gibbs, and Bob Ollis (an executive who was in charge of monitoring the cotton deals for Gibbs) discussed the idea of expanding the relationship between GSA and Performance to include the financing of larger cotton transactions (by the pound rather than by the truckload). The discussions of this meeting were memorialized in a working agreement dated September 16, 1994. The working agreement provided that GSA would establish a $1 million line of credit in favor of Performance "for the purpose of purchasing and hedging cotton." Nine hundred thousand dollars of this money was to be used for purchasing cotton on the open market, and $100,000 was to be used for hedging cotton positions taken by Performance. Performance was to market cotton to buyers (textile mills) with a targeted profit margin of at least $0.04 per pound of cotton sold. The profits on cotton transactions completed under the terms of the working agreement were to be split equally between Performance and GSA. Although all the trial testimony indicated that Performance and GSA began doing business on a larger scale after the September meeting and that profits were to be split equally between them, the working agreement was never signed, and Mason and the government disagree about the extent to which other aspects of the agreement were put into practice. Mason contends that the working agreement gave Performance substantial autonomy in arranging cotton transactions and that the $1 million line of credit referred to in the working agreement was essentially a loan from GSA to Performance.

In support of his contention, Mason points out that GSA deposited $100,000 into a commodities trading account on September 21, 1994, and that Reid was given authority to trade on that account. Mason argues that the commodities trading account was intended to be used for hedging cotton positions taken by Performance, though it is undisputed that Reid used his trading authority to speculate in cotton futures unrelated to his work with Performance and that Reid lost most of the money that Gibbs had put into the trading account. In addition, Bob Ollis testified that the portion of the working agreement regarding the $1 million line of credit in favor of Performance was put into practice. The government, in contrast, points to testimony from Gibbs that those portions of the working agreement regarding a line of credit and the hedging of cotton positions were never put into practice. Gibbs claimed that although the scale of the transactions was to be larger after September 1994, the basic terms of the working relationship between Performance and GSA remained unchanged. According to Gibbs, Performance still had to arrange to buy and sell cotton at specified prices and was required to present the terms of proposed transactions to Gibbs so that he could determine his profit margin before agreeing to finance a particular transaction. Gibbs also testified that after the September 1994 meeting, he continued to pay the cotton suppliers directly and that he still considered himself the owner of the cotton that Performance sold and delivered to textile mills.

The transaction that ultimately led to Mason's conviction is referred to as Deal 104 in GSA's records. It took place in November 1994. Mason's friend and co-defendant, William Lawson, was a Georgia cotton dealer who ran a company called Southern Cotton Co. in Cochran, Georgia. Lawson helped to negotiate a series of contracts calling for the sale and delivery of 9,000 bales of cotton from Performance to Avondale Mills in Sylacauga, Alabama, over a period of 10 months beginning in early 1995. Mike Campbell signed the contracts as the agent for Performance on November 21, 1994. According to Lawson, on that same day Mason called him and said that he had $768,000 available to buy cotton from Lawson for use in fulfilling the Avondale Mills contracts. Mason told Lawson that the person financing the deal (Gibbs) wanted to buy his cotton from a bonded warehouse rather than from Southern Cotton Co. Lawson and Mason then agreed that the cotton sale would be processed through a business

Lawson had once operated under the name "Cochran Bonded Warehouse." It is undisputed that Cochran Bonded Warehouse was not an active business in November 1994 and that there was in fact no cotton available for sale in the Cochran Bonded Warehouse. Lawson agreed to draw up an invoice billing Performance for the purchase of 2,340 bales of cotton from Cochran Bonded Warehouse for $768,150.00. Mike Campbell signed the invoice as "accepted" on behalf of Performance on November 22, 1994. On November 25, 1994, Lawson faxed this invoice to GSA along with a cover letter from Mike Campbell that said: "Vendor invoices for 2,430 bales purchased provisionally to begin deliveries against these [Avondale Mills] contracts. Please wire transfer $768,150 to cover cost of cotton." (As we explain below, the November 25 fax became the critical piece of evidence in the government's case against Mason.) Gibbs approved the deal and wired the money to Lawson as requested. Lawson testified that although there was no cotton available for sale in the Cochran Bonded Warehouse when he sent the fax to GSA, he had "cotton on [his] desk to buy," and he intended to buy cotton as needed for Performance to fulfill the Avondale Mills contracts. Lawson admitted, however, that not all of the $768,150 he received from GSA was used to buy cotton for sale to Avondale Mills. On November 10 Lawson and Mason had reached an agreement on a side venture involving the cleaning of cotton motes.[1] Under the terms of this agreement Lawson was to reopen a cotton cleaning business called AmeriCott that he had previously operated in Spartanburg. Mason was to pay AmeriCott eight cents per pound for cleaning cotton motes and was to share profits from the sale of the cleaned motes with Lawson. According to Lawson, Mason authorized Lawson to use some of the $768,150 he had received from Gibbs to get the AmeriCott venture started. Apparently Lawson and Mason planned to use their profits from the AmeriCott venture to buy cotton to fulfill the Avondale Mills contracts as deliveries became due.

Ultimately, Performance supplied Avondale Mills with some but not all of the cotton Performance had contracted to deliver in the first

---

[1]Cotton motes are byproducts of the cotton ginning process that contain significant amounts of cotton fiber mixed in with "trash" (nonuseable material). The motes can be recleaned in order to isolate the cotton fibers, and the cleaned motes can then be used in a variety of applications.

months of 1995. By March 1995 Gibbs had received about $641,000 from Avondale Mills rather than the $768,150 plus profits that he had been expecting. Gibbs suspected that there were problems at Performance; upon reviewing his accounts receivable, he determined that Performance owed him in excess of $1 million from various cotton deals.[2] Gibbs met with Reid on March 23, 1995. He learned for the first time at this meeting that Mason was the owner of Performance. Gibbs testified that he would never have done business with Performance if he had known that Mason was involved because he had known Mason "for a lot of years and knew of his past reputation." GSA filed a civil lawsuit against Performance, Mason, Reid, Campbell, and Lawson the next day. Ultimately, the parties reached a settlement agreement under which Mason transferred to Gibbs a total of $370,690.14 in cash, assigned claims, and cotton inventory. In addition, Lawson agreed to pay Gibbs $150,000.

On March 3, 1999, the United States indicted Mason and Lawson for wire fraud in connection with Deal 104 in the District of South Carolina. Mason was also indicted on two counts of mail fraud. Lawson pled guilty, but Mason elected to stand trial. The jury found Mason guilty of wire fraud, but acquitted him on the two counts of mail fraud. Mason was sentenced to 18 months in prison, three years of supervised release, and 200 hours of community service. He was also ordered to pay $30,000 in restitution. Mason now appeals.

## II.

### A.

Mason first argues that the district court erred by refusing to grant his motion for judgment of acquittal under Fed. R. Crim. P. 29 because the evidence did not adequately support his wire fraud conviction. In evaluating the sufficiency of the evidence, we do not assess the credibility of the witnesses, and we assume that the jury has

---

[2]It appears that Mason was undone by a rapid rise in the price of cotton in early 1995. Because Performance had not hedged its contracts with Avondale Mills, it soon found itself having to pay more for each bale of cotton it delivered than Avondale was required to pay. Losses mounted, and eventually Performance stopped delivering cotton altogether.

resolved all contradictions in favor of the government. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

Wire fraud under 18 U.S.C. § 1343 requires proof of "(1) a scheme to defraud and (2) the use of a wire communication in furtherance of that scheme." *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995) (internal quotation marks and citation omitted).[3] The scheme to defraud must involve material misrepresentations, *Neder v. United States*, 527 U.S. 1, 25 (1999), and the defendant must have acted with fraudulent intent, *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993). The wire fraud indictment against Mason and Lawson listed two fraudulent misrepresentations made by them in furtherance of their scheme to defraud. The government concedes that it failed to prove the misrepresentation alleged in paragraph 2 of Count One of the indictment.[4] The government's case therefore stands or falls on the allegation in paragraph 3 of Count One that Mason and Lawson "did falsely represent to Gibbs Special Assets, Inc., that Performance Cotton Company had purchased 2,430 bales of cotton from Cochran Bonded Warehouse for $768,150.00." In other words, the government's case depends on whether the invoice faxed to GSA on November 25, 1994, contained at least one fraudulent, material misrepresentation.

Mason argues that the fax represented only that Performance had entered into a contract to purchase cotton from Cochran Bonded

---

[3]18 U.S.C. § 1343 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

[4]Paragraph 2 alleged that Mason had concealed from Gibbs that Mason was a partner in PCC Cotton Purchasing LP, another company run by Mason. Because PCC Cotton Purchasing LP had nothing to do with Deal 104, the government concedes that "there was insufficient evidence of this aspect of the scheme to defraud." Brief of United States at 18.

Warehouse for sale to Avondale Mills. According to Mason, all the evidence at trial indicated that this representation was true. Lawson testified that when he sent the fax, he and Mason had every intention of fulfilling the contract by shipping cotton to Avondale Mills.[5] Because there was a genuine agreement for Performance to buy cotton from Cochran Bonded Warehouse and sell it to Avondale Mills, Mason argues that there are no misrepresentations in the November 25 fax and that his conviction must be reversed because the evidence was not sufficient to support the jury's verdict. Assuming for the sake of argument that no reasonable jury could doubt Lawson's claim that he and Mason intended to fulfill the contract faxed to GSA, Mason's Rule 29 challenge still fails because a reasonable jury could find that the fax contains other material misrepresentations that were made with fraudulent intent. First, and most obviously, the fax represented that Performance would purchase cotton from Cochran Bonded Warehouse, a defunct company that Lawson and Mason used to deceive Gibbs about the ultimate source of the cotton. A reasonable jury could find that this misrepresentation was material because the jury heard testimony that Gibbs wished to deal only with bonded warehouses. Second, the fax surely made an implied representation that any money wired by GSA would be used by Performance exclusively to buy cotton for delivery to Avondale Mills. *Cf. Linden v. United States*, 254 F.2d 560, 568 (4th Cir. 1958) ("Deception [in a mail fraud case] is not necessarily confined to a direct statement of fact. Not words alone, but their arrangement, the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive, even though the words themselves fall short of this."). Yet Lawson testified that he and Mason intended to divert, and did divert, a substantial portion of that money into their AmeriCott mote cleaning venture. A reasonable jury could also find this misrep-

---

[5]Lawson had signed an affidavit in the course of the civil suit brought by GSA stating that at the time the fax was sent, he "did not intend to purchase the cotton." In other words, Lawson appeared to claim that the entire contract between Performance and Cochran Bonded Warehouse was a sham and that Mason and Lawson never intended for any of the money to be used to buy cotton in fulfillment of the contracts with Avondale Mills. During trial, however, Lawson testified that he and Mason had always intended to perform the Avondale Mills contracts and to repay Gibbs.

resentation to be material, for it seems highly doubtful that Gibbs would have approved the wire transfer had he known that Mason and Lawson would treat the funds as an interest-free loan for their Ameri-Cott venture. Finally, a reasonable jury that interpreted the fax in the light of Gibbs's testimony about the business relationship between GSA and Performance could read the fax as a fraudulent representation that there were 2,430 bales of cotton sitting in Cochran Bonded Warehouse and that these bales would belong to GSA as soon as Lawson received the wire transfer. A jury could also reasonably find that this representation was material because Gibbs testified that he wanted to take immediate possession of all the cotton he bought for future sale so that he might be protected from price fluctuations in the cotton market. Accordingly, we conclude that the government presented sufficient evidence to support the jury's verdict that Mason engaged in a scheme to defraud GSA.

B.

Next, Mason argues that his conviction must be reversed because of a fatal variance between the allegations of the wire fraud count (Count One) and the government's evidence at trial. "When the government, through its presentation of evidence and/or its argument . . . broadens the bases of conviction beyond those charged in the indictment, a constructive amendment — sometimes referred to as a fatal variance — occurs." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999). A constructive amendment or fatal variance violates the Fifth Amendment right to be indicted by a grand jury and is *per se* error. *Id.* Not every difference between the indictment and the trial evidence results in a fatal variance, however. The test is whether the evidence presented at trial "change[s] the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *Id.* (internal quotation marks and citations omitted). When the trial evidence does not alter the crime charged in the indictment, a mere variance occurs, and the defendant's constitutional rights are not violated unless the variance "prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *Id.*

Here, Mason claims that the government constructively amended the wire fraud count by arguing to the jury that the November 25 fax

falsely represented to GSA that there was cotton in Cochran Bonded Warehouse. According to Mason, this "no cotton in the warehouse" theory offered the jury a possible basis on which to convict Mason that was never authorized by the grand jury. Mason points out that paragraph 3 of the wire fraud count said only that Mason falsely represented that Performance "had purchased 2,340 bales of cotton from Cochran Bonded Warehouse," and he argues that this theory of fraud cannot encompass the government's "no cotton in the warehouse" theory. Mason's argument turns, then, on whether paragraph 3 of Count One commits the government to a specific theory of the fraudulent scheme that excludes the "no cotton in the warehouse" theory. We hold that it does not. While Mason plausibly contends that the indictment is most naturally read to claim that the November 25 fax falsely represented the existence of a contract between Performance and Cochran Bonded Warehouse, the language of the indictment is general enough to encompass the government's "no cotton in the warehouse" theory. We cannot say that the difference between a false representation of an agreement to buy cotton and a false representation that the seller had cotton on hand for purchase is great enough "to change the elements of the crime charged." *Randall*, 171 F.3d at 203. *Cf.* 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal* § 516 at 27 (2d ed. 1982) (stating that courts have found a constructive amendment where "the prosecution presents a complex of facts distinctly different from that set forth in the charging instrument and not . . . where there is a single set of facts"). If there is any variance here at all, it is a mere variance that would violate Mason's constitutional rights only if it unfairly surprised Mason and hindered his ability to prepare for trial or exposed him to the danger of a second prosecution for the same offense. *Randall*, 171 F.3d at 203. Here, the indictment adequately informed Mason that the November 25 fax would be at the center of the government's case, and Mason had ample opportunity to prepare a defense against the government's "no cotton in the warehouse" theory. Nor is there any risk of a second prosecution arising out of the misrepresentations contained in the November 25 fax. As a result, we hold that any mere variance between paragraph 3 of the wire fraud count and the government's evidence at trial does not require reversal.

C.

Mason also argues that the district court abused its discretion in denying his motion for a new trial under Fed. R. Crim. P. 33. In

essence, Mason contends that a new trial is warranted in the interests of justice because Gibbs's testimony was so lacking in credibility that the jury's verdict was against the great weight of the evidence. Although we agree that some of Gibbs's testimony was open to challenge, the district court's refusal to grant a new trial was well within the scope of its discretion.

D.

Finally, Mason appeals two aspects of the district court's sentencing determination. He argues that the district court erred in determining the actual loss suffered by GSA for purposes of determining Mason's offense level and by ordering Mason to pay $30,000 in restitution. We review the district court's legal interpretations of the Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000).

The base offense level for a fraud conviction is six. U.S.S.G. § 2F1.1(a). The district court ruled that the actual loss caused by Mason's wire fraud was $126,817.39 — the difference between the $768,150.00 Gibbs wired to Lawson and Mason and the $641,332.61 Gibbs received in payments from Avondale Mills. The court therefore increased Mason's offense level by seven pursuant to U.S.S.G. § 2F1.1(b)(1)(H), resulting in a total offense level of thirteen. Application note 8(b) to U.S.S.G. § 2F1.1 states that in "fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim." Relying on this application note, Mason argues that because he had already paid Gibbs more than $370,000 to settle the civil suit Gibbs had filed against him, the district court should have ruled that Gibbs's actual loss from Deal 104 was zero. We are unpersuaded. The Guidelines provide offense level adjustments for the amount of loss caused by criminal fraud so that the punishment might mirror the seriousness of the crime. According to application note 8(b), the seriousness of the fraud in cases of fraudulent loan application and fraudulent contract procurement cases is normally a function of either the intended or the actual loss to the victim, whichever amount is greater. Thus, to the extent that note 8(b) applies to this case, the district court acknowledged its force by using Gibbs's actual loss on Deal 104 (rather than the $768,150.00 Gibbs wired to Lawson and Mason) to determine Mason's offense level.

Mason would have us go further by reducing the loss amount to zero based on settlement payments made by Mason to Gibbs after his fraud had been discovered. This cannot be correct because these payments simply have nothing to do with the seriousness of Mason's fraudulent conduct. As the district court observed during the sentencing hearing, Mason's argument would appear to suggest that "if somebody robs a bank and pays all the money back before trial or before sentencing . . . the guidelines [would set] the offense level for bank robbery [at] a zero loss." *Cf. United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (observing that from a legal perspective, a victim's loss would not be reduced "if a pickpocket got cold feet and returned his victim's wallet before the victim discovered it had been missing"). We agree with the district court that application note 8(b) does not support Mason's argument. We therefore affirm the district court's determination that the actual loss to Gibbs for purposes of determining Mason's offense level was $126,817.39.

Mason also challenges the district court's order that he pay $30,000 in restitution to GSA. We review restitution orders for abuse of discretion. *United States v. Blake*, 81 F.3d 498, 505 (4th Cir. 1996). Again, Mason argues that his settlement payments to Gibbs exceeded the actual loss from Deal 104 ($126,817.39) and that any restitution ordered by the district court was a windfall to Gibbs. The argument finds apparent support in 18 U.S.C. § 3664(j)(2), which provides that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in any federal or state civil proceeding. Although Mason's settlement payments to Gibbs occurred before rather than after the restitution order, the logic of the statute surely implies that restitution is not warranted when the victim has already been fully compensated for his loss. The critical question here, however, is whether Mason's settlement payments to Gibbs covered the "same loss" that Gibbs suffered from Deal 104. The government presented evidence that Gibbs lost close to $1 million on various transactions with Performance, that the settlement agreement did not compensate Gibbs for all of his actual losses on these transactions, and that the settlement agreement did not assign losses to particular transactions. Accepting this evidence, the district court reasoned that Mason had already paid Gibbs roughly $370,000 — 37% of the $1 million Gibbs lost in his dealings with Performance. The court essen-

tially apportioned the payments already made by Mason among the various transactions between Performance and GSA and credited Mason with having compensated Gibbs for 37% of Gibbs's losses from Deal 104. The court therefore determined that the actual loss to Gibbs for purposes of Mason's restitution order was roughly $80,000 (approximately 63% of $126,817.39). Upon consideration of Mason's financial resources, financial needs, and earning ability, the district court then reduced the amount of restitution to $30,000. The court found that upon his release from prison, Mason would have the earning capacity to pay this amount in equal monthly installments over a three year period without burdening himself or his dependents. The district court did not abuse its discretion in reaching this conclusion, and the court's restitution order is therefore affirmed.

## III.

For the foregoing reasons, we conclude that Mason's conviction and sentence are free from error. Accordingly, the judgment of the district court is

*AFFIRMED.*